[No. C012467. Third Dist. Feb. 18, 1993.]

STATE BOARD OF EDUCATION, Petitioner, v.
BILL HONIG, as Superintendent, etc., Respondent.

Counsel

Zumbrun, Best & Findley, Ronald A. Zumbrun, John H. Findley, Sharon L. Browne, and Meriem L. Hubbard for Petitioner.

Joseph R. Symkowick, Roger D. Wolfertz, Allan H. Keown, Michael E. Hersher, Joanne Lowe and Paul G. Smith for Respondent.

Gray, Cary, Ames & Frye, Paul J. Dostart, Kronick, Moskovitz, Tiedemann & Girard, John Bukey, Donna Matties, Van Bourg, Weinberg, Roger & Rosenfeld, Stewart Weinberg, and James G. Seely as Amici Curiae on behalf of Respondent.

Opinion

**NICHOLSON, J.**—The California Department of Education (Department) is administered through a State Board of Education (Board), appointed by the Governor and confirmed by the Senate, and an elected Superintendent of Public Instruction (Superintendent). (Cal. Const., art. IX, § 2; Ed. Code, §§ 33000, 33301, 33303.)[1] The Board is "the governing and policy determining body of the department." (§ 33301, subd. (a).) The Superintendent is vested with all executive and administrative functions. (§ 33301, subd. (b).) Although the statutory division of responsibility for administration of the Department appears clear, its implementation has fostered occasional turf battles between the Board and various Superintendents for more than 70 years. This original proceeding represents the latest skirmish.

The Board seeks a peremptory writ of mandate ordering the Superintendent to implement a series of policies adopted by the Board in September 1990 and April 1991. The Superintendent responds he has voluntarily implemented some of the policies, but argues he is under no clear, present, and ministerial duty to implement any of them.

---

[1]All statutory references are to the Education Code unless otherwise indicated.

The policies involve four areas of governance: approval of the Department's program guidelines; appointment of constitutionally authorized deputy and associate superintendents; approval of the Department's proposed budget and continuing oversight of that budget; and appointment of Board staff.[2] Also at issue are requests the Superintendent prepare a Department organizational chart consistent with the legal opinion of the Board's special counsel, and process a $150,000 legal services contract to enable the Board to pay independent counsel hired to pursue litigation against the Superintendent.

We conclude the Board is entitled to a writ of mandate directing the Superintendent to (1) implement Policy No. 2 by submitting to the Board his nominations for deputy and associate superintendents under article IX, section 2.1 of the California Constitution; (2) implement Policy No. 5 which concerns the Board's request for additional staff; (3) implement the continuing budget oversight policy relating to the Board's periodic review of performance evaluations for key Department employees; and (4) process the Board's legal services contract in the manner requested by the Board. The petition is denied in all other respects for reasons we shall explain.

HISTORICAL AND PROCEDURAL BACKGROUND

I

HISTORICAL PERSPECTIVE

The constitutional and statutory scheme which divides administrative responsibility between the Superintendent and the Board has existed for more than 70 years.

California's first Constitution, enacted in 1849, stated "[t]he legislature shall provide for the election, by the people, of a superintendent of public instruction, who shall hold his office for three years, . . ." (Cal. Const. of 1849, art. IX, § 1.) Although provisions relating to the term of office and manner of election have been amended from time to time (Cal. Const. of 1849, art. IX, § 1, as amended in 1862; Cal. Const. of 1879, art. IX, § 2, as amended in 1960, and in 1990 by Prop. 140), the position of Superintendent remains an elective office. (Cal. Const., art. IX, § 2.)

In 1852, the Legislature established the first Board, which consisted of the Governor, Surveyor-General, and the Superintendent. (Stats. 1852, ch. 53,

---

[2]The full text of the policies adopted by the Board appears as an appendix to this opinion at pages 772-776, *post.*

art. I, § 1, pp. 117-118; see Ferris, Judge Marvin and the Founding of the California Public School System (1962) p. 80.) The Board advised and supervised the Superintendent on apportionment of state school funds to the counties. (Stats. 1852, ch. 53, art. IV, § 1, subd. 5, pp. 122-123.)

Legislation enacted in 1870 changed the composition of the Board to include "the Governor, the Superintendent of Public Instruction, the Principal of the State Normal School, the Superintendent of Public Schools of the City and County of San Francisco, the Superintendent of Common Schools of the respective Counties of Sacramento, Santa Clara, Alameda, Sonoma and San Joaquin, and of two professional teachers, who shall be nominated by the Superintendent of Public Instruction, and elected by and with the advice and consent of said Board; . . ." (Stats. 1869-1870, ch. 556, § 1, p. 824.)

An 1884 constitutional amendment granted the Board authority to establish a uniform system of textbooks. However, Board members still served "ex officio," that is, by virtue of their positions as Governor, Superintendent, and principals of the normal and common schools. In 1894, the president of the University of California, "and the professor of pedagogy therein" became ex officio members of the Board. (Cal. Const. of 1879, art. IX, § 7, as amended in 1884 and 1894; see also Mem. to Art. IX Com. Members, Const. Revision Com. (Nov. 22, 1966) p. 1.)[3]

In 1912, a constitutional amendment abolished the ex officio Board, stating "[t]he Legislature shall provide for the appointment or election of the State Board of Education . . . ." (Cal. Const. of 1879, art. IX, § 7, as amended in 1912.) In 1913, the Legislature amended section 1517 of the Political Code thereby establishing a Board of seven members to be appointed by the Governor to serve four-year terms. (Stats. 1913, ch. 328, § 1, p. 659.) It also amended section 1518 of the Political Code to outline the respective duties of the Board and Superintendent: "The superintendent of public instruction shall be secretary of the board. Such secretary shall have charge of all correspondence and keep a record of its proceedings. The superintendent of public instruction shall act as the executive officer of the state board of education. *It shall be the duty of the state board of education to determine all questions of policy; it shall be the duty of the superintendent of public instruction to execute, under direction of the board, the policies which*

---

[3]In 1868, an organic act created the University of California as a public corporation separate from the Board and Superintendent "under the charge and control of a Board of Directors, to be known and styled 'the Regents of the University of California.'" (Stats. 1867-1868, ch. 244, §§ 1 and 11, pp. 248 and 252.) The Constitution of 1879 established the University of California as a public trust. (See prior law annot., 2 Deering's Const. Ann. (1974 ed.) foll. art. IX, § 9, p. 621.)

*have been decided upon, and to direct, under such general rules and regulations as the state board of education may adopt,* the work of all assistant superintendents of public instruction, and such other appointees and employees of the board as may be provided by law." (Stats. 1913, ch. 328, § 2, pp. 659-660, italics added.)

The Superintendent was also responsible for superintending the schools of the state. (Former Pol. Code, § 1532.) A historian later observed: "The constitutional amendment of 1912 and the legislation of 1913 resulted in a new attitude toward the agency for public education at Sacramento. Previously it had been dominated by the superintendent, and the unofficial term 'Department of Public Instruction' was frequently employed. From 1913 on, the State Board of Education became of increasing importance, and the unofficial term 'Department of Education' was more often employed in speaking of the activities of the public education agency. Previously the board had been a professional ex-officio body advising and assisting the superintendent; now there was a lay body assuming responsibility for a growing number of functions." (Johnson, Development of the Central State Agency for Public Education in California, 1849-1949 (1952) p. 77.)

The practical result of the foregoing constitutional and statutory scheme was that two educational agencies functioned within the state government. Although the Board and Superintendent cooperated effectively for a number of years to expand California's educational services, observers predicted trouble. In 1919, the Blue Bulletin, a publication of the State Department of Education, warned: "The fact that the two state departments of education have in the past succeeded in working together, and that the recent promotion of an officer of the state board to the position of Superintendent of Public Instruction insures the welding together of the two departments for the present, should not lull the people into forgetfulness of the fact that legally we have two more or less distinct state departments. No one can say how soon a change in personnel in these two departments may bring them into conflict. They are both administrative departments and conflict between them would be disastrous to educational leadership in this state." (E. R. Snyder, *State Department Reorganization* (Mar. 1919) Cal. Blue Bul., p. 2.)

The Legislature also recognized an appointed Board and elected Superintendent were destined for conflict. A special legislative committee on education, chaired by Senator Herbert Jones (Mem. to Art. IX Com. Members, Const. Revision Com., *supra*, p. 3), reported in 1920: ". . . that part of the state educational organization represented by the State Board of Education is clearly responsible to the Governor and the Legislature for its acts, while

that part represented by the Superintendent of Public Instruction remains independent of both State Board of Education and Governor, and largely independent of the Legislature as well, and may work with the State Board of Education or against it, according to the character of the official elected to the office of Superintendent. [¶] . . . [¶] Still more, an antagonized or antagonistic Superintendent might at some time raise the constitutional question as to the right of the State Board of Education to do anything whatever in the nature of supervision, claiming that it has no power other than regulatory power. In support of this he could claim that the superintending function, in its very nature, is an integral and indivisible function— that there cannot be two superintending agencies." (Rep. of the Special Legis. Com. on Ed. (Cal. State Printing Off. 1920) p. 19.)

The "Jones Report" found "[t]he present state school administrative organization in California is double-headed, and contains elements that could easily produce discord and destroy its efficiency." (Rep. of the Special Legis. Com. on Ed., *supra*, at p. 30; Mem. to Art. IX Com. Members, *supra*, at p. 3.) It recommended a constitutional amendment to abolish the elected office of Superintendent and replace it with a Commissioner of Education appointed by the Board. (Rep. of the Special Legis. Com. on Ed., *supra*, p. 30.) It also recommended the educational organization be unified under a State Department of Education. (*Ibid.*)

In 1921, the Legislature created a unified Department of Education. The Department was to be "conducted under the control of an executive officer to be known as director of education, . . ." (Stats. 1921, ch. 605, § 1, pp. 1033-1035.) Under this statute, the Superintendent was ex officio Director of Education. (*Ibid.*) The implementing legislation added former Political Code section 362b which provided the Department ". . . shall succeed to and is hereby invested with all the duties, powers, purposes, responsibilities and jurisdiction of the state board of education" and various other existing boards. (Stats. 1921, ch. 605, § 1, pp. 1034-1035.)

The 1921 reorganization did not significantly alter the relationship between the Board and Superintendent. Predictions of open conflict were realized in 1926, when a newly appointed Board refused to confirm the candidates the Superintendent appointed as presidents for the state colleges at San Francisco and San Jose. (Mem. to Art. IX Com. Members, *supra*, at p. 3; Bull. No. G-2, Cal. State Dept. of Education (Cal. State Printing Off. 1928) p. 8.)[4] In 1927, the Legislature amended the Political Code to provide for Senate confirmation of the Governor's appointments to the Board. (Stats. 1927, ch. 453, § 1, p. 774.)

---

[4]In 1959, the Legislature created an administrative board designated as the Trustees of the California State University which assumed the functions formerly executed by the Board and

As a result of this impasse, the November 1928 ballot included Proposition 6, a proposed constitutional amendment expanding the Board to 10 members, and extending the Board's term to 10 years. The proposed amendment also authorized the Legislature to eliminate the elected position of Superintendent and create a Director of Education to be appointed by the Board. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 6, 1928), arguments for and against Prop. 1, pp. 12-13.) The proposed amendment was defeated by voters. (Mem. to Art. IX Com. Members, *supra*, at p. 3; Statement of Vote, Gen. Elec. (Nov. 6, 1928) p. 32.)

In 1929, the Legislature enacted a separate School Code. (Sch. Code (Cal. State Printing Off. 1929) p. 1.) Section 2.1321 of that School Code provided: "The state department of education shall be administered through: [¶] (1) The state board of education which shall be the governing and policy determining body of the department; [¶] (2) The state director of education in whom all executive and administrative functions of the department are vested and who is the executive officer of the state board of education." (Stats. 1929, ch. 162, p. 303; Sch. Code, *supra*, p. 107.) This statutory language is now found in section 33301.

There was little legislative activity in the education field during the next two decades. However, near the end of World War II, the State Reconstruction and Reemployment Commission issued a report recommending various educational reforms, including a constitutional amendment to "provide for the selection of [the Superintendent] by a lay board rather than by popular vote." (State Reconstruction and Reemployment Com., The Administration, Organization and Financial Support of the Public School System, State of Cal. (Feb. 1945) p. 8.) However, the proposed constitutional amendment, designated Proposition 13, did not appear until November 1958. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 4, 1958), arguments for and against Prop. 13, pp. 17-18.) It was rejected by the voters. (Statement of Vote, Gen. Elec. (Nov. 4, 1958) p. 32.)

The commission report also recommended the Superintendent be given authority to nominate four non-civil-service (exempt) administrators for election by the Board to assist the Superintendent "in the development of state-wide policy." (State Reconstruction and Reemployment Com., The Administration, Organization and Financial Support of the Public School System, State of Cal., *supra*, at p. 16.) Submitted as a constitutional amendment on the November 1946 ballot, Proposition 9 was approved by the voters. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to

Superintendent. (§§ 66600 and 66606, formerly §§ 22600 and 22604, added by Stats. 1961, First Ex. Sess. 1960, ch. 49, pp. 393-394.)

voters, Gen. Elec. (Nov. 5, 1946), arguments for and against Prop. 9, p. 9; Statement of Vote, Gen. Elec. (Nov. 5, 1946) p. 34.) The constitutional provision appears as article IX, section 2.1, and provides: *"The State Board of Education, on nomination of the Superintendent of Public Instruction, shall appoint* one Deputy Superintendent of Public Instruction and three Associate Superintendents of Public Instruction who shall be exempt from State civil service and whose terms of office shall be four years. [¶] This section shall not be construed as prohibiting the appointment, in accordance with law, of additional Associate Superintendents of Public Instruction subject to State civil service." (Cal. Const., art. IX, § 2.1, italics added.)

In 1968, the voters defeated Proposition 1, a constitutional amendment which included a provision changing the manner of selecting the Superintendent. The proposed amendment stated in part: "The Superintendent of Public Instruction shall be elected by the people, unless the Legislature by enactment of a statute passed by two-thirds vote of all members elected to each house provides for a different method of selection." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1968), full text of Prop. 1, pt. II, p. 1; Statement of Vote, Gen. Elec. (Nov. 5, 1968) p. 27.)

II

*Attorney General Opinions on Governance Questions*

We have described how the constitutional and statutory division of labor between the Board and Superintendent raised concerns about governance of the state educational system. On at least three occasions in the last fifty years, the Board and Superintendent sought the Attorney General's legal opinion on questions relating to governance.[5]

In 1943, the Board requested the Attorney General's opinion " 'as to the legal position of the State Board of Education and the State Department of Education.' " (1 Ops.Cal.Atty.Gen. 36 (1943).) The Attorney General reviewed various sections of the Constitution, School Code, and Political Code outlined above, and acknowledged the statutes were "quite contradictory and ambiguous in their terms . . . ." (*Id.* at p. 38.) He nonetheless concluded the Department was "administered jointly by a governing and policy determining body, the state board of education, and executive officer, the director of

---

[5]Although the Attorney General's interpretation of statutory law is not controlling, we accord it great respect. (See *Sonoma County Bd. of Education* v. *Public Employment Relations Bd.* (1980) 102 Cal.App.3d 689, 699 [163 Cal.Rptr. 464].)

education [Superintendent]. [¶] The only alternative interpretation would be that [the applicable sections of the School Code] leave the state board of education with no function except the adoption of elementary texts. . . . [¶] The relative positions of the director [Superintendent] and board are not unlike the relationship between the executive head of a corporation and its board of directors." (*Ibid.*)[6]

Beyond that, the Attorney General refused to address conflicts that might arise between the Board and Superintendent in the future. However, he suggested the ambiguous language be called to the attention of the Legislature "so that it may, if it deems it proper, clarify the code sections relative to the respective powers, duties and functions of the State Board of Education, the Superintendent of Public Instruction and the State Department of Education." (1 Ops.Cal.Atty.Gen., *supra*, at p. 39.) As we have seen, the Legislature took no action in that regard.

In 1954, the Superintendent asked whether the Board could set different admission standards for the 10 state colleges, and delegate to the Superintendent authority to modify those standards. (24 Ops.Cal.Atty.Gen. 215, 215-216 (1954).) The Attorney General concluded the Board had authority to set separate standards, but the Superintendent must act within the standards set by the Board. Pertinent to our inquiry is the Attorney General's explanation of what it meant to *execute* Board policy concerning admission standards: "the director [Superintendent] has the duty to see that the standards set by the state board are carried into effect and may fill in the details within the framework set by the board. The board may delegate to the director [Superintendent] as administrative officer the power to determine specific facts upon which an application of the board's rule is made to depend. By such delegation the director is vested with mere ministerial and administrative functions which are to be exercised in obedience to and in conformity with the definite rules, guides and standards." (*Id.* at p. 218.)

A more heated governance question gave rise to the Attorney General's "Rafferty Opinion." (41 Ops.Cal.Atty.Gen. 105 (1963).) Max Rafferty, the Superintendent, supported certain legislation relating to education. The Board adopted a resolution directing the Superintendent to inform the Legislature of the Board's opposition to the legislation and the reasons for that opposition. At the same time, the Board encouraged the Superintendent to make his own recommendations to the Legislature, so long as he indicated they were not the Department's recommendations. (*Id.* at p. 107.)

---

[6]We find the corporate analogy helpful because it allocates responsibility for policy development and oversight, and decisionmaking and control. Moreover, it defines the substance and structure of the relationship.

The Superintendent asked the Attorney General to advise him whether "the Superintendent of Public Instruction as an elected constitutional officer [has] the legal right to refuse to execute an order of the board to perform an act which would be contrary to his beliefs and wishes[.] Specifically, can he, in his capacity as Superintendent of Public Instruction, lawfully support a legislative bill which the state board has ordered to be opposed by the executive officer of the board and by the department?" (41 Ops.Cal.Atty.Gen., *supra*, at p. 105.)

The Attorney General looked to the Constitution and statutes to determine the scope of authority of the Board and Superintendent. (41 Ops.Cal.Atty.Gen., *supra*, at p. 108.) Repeating the corporate analogy (1 Ops.Cal.Atty.Gen., *supra*, at p. 38), he concluded "the ultimate governing and policy making body for the department and its officers and employees . . . is the State Board of Education. *Without ultimate control over the conduct of the officers and employees of the Department of Education, the State Board of Education cannot insure the implementation of its policies.*" (41 Ops.Cal.Atty.Gen., *supra*, at p. 111, italics added.) Thus, the Superintendent may not properly refuse to execute an order solely because the order is contrary to his own personal beliefs and wishes. (*Id.* at p. 106.) The Attorney General closed with the observation: "This analysis of the respective powers and duties of the State Board of Education and the Superintendent of Public Instruction once again underscores the long-recognized problem existing in this area. It would be fruitless here to discourse upon the difficulty of requiring a policy-making board appointed by the Governor [and confimed by the Senate] to have its policies carried out by and through an individual who is elected by the people." (*Id.* at pp. 114-115.)[7]

With this historical foundation in mind, we turn to the specifics of the case before us.

---

[7]The Attorney General's comments do not lessen the usefulness of the corporate analogy. The substance and structure of the relationship between the corporate board and its chief executive officer are essentially the same as the relationship between the Superintendent and the Board. The Attorney General merely focuses on differences in mechanics. Thus, while a corporate board of directors has swift and effective ways to hold its chief executive officer accountable for his or her failure to implement policy, the Board does not.

## III

### *The Procedural Context of This Case*

In February 1990, the Little Hoover Commission[8] issued a report entitled, "K-12 Education in California: A Look at Some Policy Issues" (1990 Little Hoover Commission Report). The commission found the structure of the California educational system was not operating as legally intended. It observed "the Superintendent of Public Instruction has assumed the role of policy maker and the State's schools are without the benefits associated with an educational policy governed by a strong state board." (1990 Little Hoover Com. Rep., p. 1.) Two of the commission's eight recommendations are relevant to the current dispute.

First, the commission urged enactment of legislation giving the Board express authority to approve proposed Department budgets. "Such an amendment should make it clear that the Board's authority is superior to the authority of the Department over the proposed budget for the Board's activities as well as the activities of the Department." (1990 Little Hoover Com. Rep., *supra,* at p. 35.) Second, based on a concern the Department was circumventing the State's regulatory process in its approval and distribution of program guidelines, the commission recommended the Attorney General file an action to prevent further alleged violations of the Administrative Procedure Act. (*Id.* at pp. 35-36.)

The 1990 Little Hoover Commission Report prompted Board action. On September 14, 1990, the Board adopted five policies and approved related amendments to its bylaws. Policy No. 1 provides for review and approval of all Department program guidelines. Policy No. 2 pertains to nomination of constitutionally authorized deputy and associate superintendents. Policy No. 3, which involves appointment of an acting Board secretary when the Superintendent is out of the state, is not at issue in these proceedings. Policy No. 4 relates to approval and oversight of the Department budget. Policy No. 5 provides for the funding and appointment of additional staff to the Board.[9] The Board directed the Superintendent to perform the administrative work necessary to implement its policies.

At the October 12, 1990, Board meeting, the Superintendent presented a legal memorandum prepared by the Department's general counsel which

---

[8]The Little Hoover Commission, also known as the Commission on California State Government Organization and Economy, "was created by the Legislature as a permanent, independent board of review over activities relating to the organization and economical operation of the executive branch of the state government." (Cal. Roster (1989) p. 68.)

[9]The text of the challenged policies and related bylaw revisions appears as an appendix to this opinion at pages 772-776, *post.*

asserted four of the five policies were not authorized by law and could not be adopted by the Board. The Superintendent stated the Board could obtain advice from independent legal counsel if conflict arose over specific policies. The Board identified five areas of existing or potential conflict with general counsel's legal opinion. It requested separate legal counsel to review the challenged policies with the Superintendent, and identify areas of agreement. On October 15, 1990, following consultation among Board President Dr. Joseph Carrabino, Board member Joseph Stein, and the Superintendent, the Department entered into a legal services contract with Howard Dickstein, an attorney who had previously worked with the Little Hoover Commission on educational issues.

Dickstein submitted his legal opinion to the Board on December 7, 1990. He concluded the Board had "the authority to achieve each of the objectives it sought to achieve when it adopted the policies . . . ." He recommended revisions "to more clearly express the intent of the Board and to limit their scope to coincide with the Board's legal authority over policy and governance." The Department's general counsel prepared a brief response to Dickstein's opinion.

The Board, Superintendent, and their respective counsel attempted to resolve the governance issues. Two proposed memoranda of understanding were prepared over a period of several months. Dickstein's first proposed memorandum of understanding (First Memorandum), dated December 4, 1990, included a budget oversight provision. A second proposed memorandum of understanding (Second Memorandum), dated January 8, 1991, omitted the budget oversight provision. Dickstein presented the Second Memorandum at the January 11, 1991, Board meeting. The Superintendent urged the Board to approve it. After lengthy discussion, the Board voted to postpone its vote.

On March 6, 1991, the Board rejected the Second Memorandum. It also rejected legal opinions prepared by the Department's general counsel on October 10, 1990, and December 13, 1990, which were in conflict with Dickstein's December 7, 1990, legal opinion, and accepted the latter. The Board confirmed "it was the Board's intent in adopting the September 1990 policies to exercise budget oversight and approval authority over the California Department of Education Budget." Finally, the Board directed the Superintendent to prepare policies, procedures, bylaw changes, and regulations necessary to implement the Board's budget approval and oversight authority.

The Board reaffirmed its rejection of the Second Memorandum at the April 12, 1991, Board meeting. It also adopted a resolution "that the Board

obtain independent counsel for the purpose of seeking declaratory relief action to clarify the governance and authority of the Board and the Superintendent." The Superintendent described the procedure to be followed to secure funding for outside counsel, stating "the Board must send a formal request to him and . . . pass a motion." He also suggested the Board go to the Legislature for funding for legal counsel because there was no money in the Department budget for that purpose.

On April 18, 1991, Carrabino asked the Superintendent to respond at the next Board meeting to the Board's recent actions on authority and governance. On May 1, 1991, the Superintendent requested clarification of "significant inconsistencies" between the Board's actions and Dickstein's December 7, 1990, legal opinion.

Carrabino responded on May 8, 1991, that the action taken by the Board at its April meeting confirmed its intent to adopt the September 1990 policies. The policies and any administrative work necessary to implement those policies were to incorporate the changes suggested in Dickstein's legal opinion of December 7, 1990. Implementation of the budget oversight provision was to be consistent with the First Memorandum.[10] Organizational charts were to be consistent with Dickstein's legal opinion. Carrabino told the Superintendent he expected the Superintendent to advise the Board at its June meeting that he had made a good faith effort to comply with the Board's directions.

Attempts at clarification continued at the June 14, 1991, Board meeting. The Board sought the Superintendent's response regarding implementation of policies that required no clarification. The Superintendent did not respond to this request. The Board ratified Carrabino's May 8 memo to the Superintendent as the expression of its intent to have budget oversight implemented in accordance with the provisions of the First Memorandum. The Board then authorized Carrabino to "enter into contract with a private counsel for the purpose of seeking legal advice to explore the possibility of litigation in the event litigation is necessary . . . ." It also directed the Superintendent to allocate Department funds to pay independent counsel, but the Superintendent responded no funds would be expended for that purpose.

Several months before, counsel for the Little Hoover Commission asked the Office of Administrative Law to determine whether certain Department program guidelines were prescriptive regulations subject to the Administrative Procedure Act. In June 1991, the Department's general counsel sent its

---

[10]The text of the budget oversight provisions of the First Memorandum is found in the appendix at pages 772-776, *post.*

response to the Office of Administrative Law. The Superintendent represents the action is still pending before that agency.

On July 11, 1991, the Superintendent sent Carrabino his "latest, and perhaps final response" to the policies adopted by the Board. He reiterated his legal position that four of the five policies were not authorized by law. The Superintendent indicated he was unsure what direction he would take with respect to the constitutional appointments, but would decide when an opening occurs. He explained the extent to which he intended to cooperate with the Board by providing advance draft copies of program guidelines. He also stated he would submit the proposed Department budget to the Board before forwarding it to the Department of Finance. However, the Superintendent refused to alter the current Department organizational chart or authorize expenditure of public funds to pay for independent counsel.

The Board filed its petition for writ of mandate in the California Supreme Court on November 14, 1991. The Supreme Court transferred the petition to this court, and we issued an alternative writ. After the parties submitted extensive briefing and exhibits, we requested supplemental briefing to clarify certain legal and factual questions.

DISCUSSION

I

*Writ of Mandate*

A court may issue a writ of mandate "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; . . ." (Code Civ. Proc., § 1085.) █ Mandate will lie only where (1) the respondent has a clear, present, and usually ministerial duty to act, and (2) the petitioner has a clear, present, and beneficial right to performance of that duty. (*People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193].) However, the writ will not lie to control the discretion conferred upon a public officer or agency. (*Ibid.*) The latter rule derives from the view " '[c]ourts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . .' " (*Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4].)

These proceedings focus on the question whether the Superintendent has a clear, present, and ministerial duty to implement the policies adopted by the Board. Neither party questions the Board's beneficial right to performance of the duty, if the duty, in fact, exists.

## II

### *No Present Duty to Implement Four of the Disputed Policies*

The Superintendent offers various reasons the Board is not entitled to a writ of mandate. Among these is the assertion he is under no *present* duty to implement five of six disputed policies because (1) he has already satisfied the Board's requests to the extent he is able, or (2) his action is not yet required. We now review the legal principles which assist us in determining whether the question of the Superintendent's duty to act is either moot or unripe for resolution, analyze four of the disputed policies, and briefly discuss the legal impact of potential recurrence of conflict.

### A. *Mootness*

■ Because equitable principles apply in mandamus proceedings, we may properly consider all relevant evidence, including facts which arose after the Board filed its petition for writ of mandate. (*Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401, 407 [261 Cal.Rptr. 706].) If such evidence demonstrates the Superintendent's "willingness to perform without coercion, the writ [of mandate] may be denied as unnecessary; and if he shows actual compliance, the proceeding will be dismissed as moot." (8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 73, p. 712.) No purpose would be served in directing the Superintendent to do what has already been done. (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 671 [56 Cal.Rptr. 265, 423 P.2d 193].)

However, when a pending case involves a question of broad public interest which is likely to recur between the same parties or others, "the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot." (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]; see also *In re Jeanette H.* (1990) 225 Cal.App.3d 25, 29-30 [275 Cal.Rptr. 9].)

### B. *Ripeness*

In *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158 [188 Cal.Rptr. 104, 655 P.2d 306], the California Supreme Court considered two actions consolidated on appeal. The second of the two involved a lawsuit by the Pacific Legal Foundation and a group of coastal owners seeking a declaratory judgment, injunctive relief, and a writ of mandamus challenging the policies embodied in the commission's public

access guidelines. (*Id.* at p. 163.) ██ The court stated, "a basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy." (*Id.* at p. 169.)

The ripeness requirement prevents courts from issuing purely advisory opinions. (*Pacific Legal Foundation, supra*, 33 Cal.3d at p. 170.) "It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question." (*Ibid.*)

Quoting *Abbott Laboratories* v. *Gardner* (1967) 387 U.S. 136, 148-149 [18 L.Ed.2d 681, 691, 87 S.Ct. 1507], the Supreme Court in *Pacific Legal Foundation* adopted the federal court's approach to the ripeness doctrine in the context of an action challenging administrative regulations prior to their application: " 'The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " (*Pacific Legal Foundation, supra*, 33 Cal.3d at p. 171.)

The Supreme Court applied *Abbott Laboratories*'s two-pronged federal test for ripeness and considered: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. (*Pacific Legal Foundation, supra*, 33 Cal.3d at p. 171.) The Supreme Court concluded the challenge to the commission's public access guidelines failed both prongs of this test, and ruled the case was not ripe for judicial review. (*Id.* at pp. 172-173.)

C. *Four Policies Which May Not Be Enforced by Writ of Mandate*

1. *Review of Program Guidelines*

Policy No. 1 states that all program guidelines "shall be reviewed and approved by the Board prior to distribution to schools and/or school officials." The policy statement sets forth detailed requirements for submission of proposed advisories and guidelines by the Superintendent and Department to the Board for review and approval.[11]

 The petition alleges the Superintendent has a clear and present duty to execute the policies adopted by the Board, but refuses to do so. It asserts the Superintendent is required to implement the policy within the specific standards set by the Board. The Superintendent maintains only he has statutory authority under section 33308.5 to review and approve program guidelines.[12] However, events which occurred after the petition was filed demonstrate the question of the Superintendent's alleged failure to execute Policy No. 1 is not appropriate for review.

In response to Policy No. 1, the Superintendent initially made the proposed program guidelines available to individual Board members for review. In February 1992, the Board's executive director informed Department deputies the Board members found the procedure unsatisfactory. The Board put a place holder[13] on its monthly agenda to permit discussion of the proposed guidelines. The Superintendent agreed to the procedure proposed by the executive director for bringing the guidelines before the full Board for its input.

The Superintendent brought approximately 10 proposed guidelines to the Board's attention during 1992. Through April 1992, agenda place holders

---

[11]The text of Policy No. 1 appears in the appendix, pages 772-773, *post.*

[12]Section 33308.5 provides:

"(a) Program guidelines issued by the State Department of Education shall be designed to serve as a model or example, and shall not be prescriptive. Program guidelines issued by the department shall include written notification that the guidelines are merely exemplary, and that compliance with the guidelines is not mandatory.

"(b) The Superintendent of Public Instruction shall review all program guidelines prepared by the State Department of Education prior to issuance to local education agencies. The superintendent shall approve the proposed guidelines only if he or she determines that all of the following conditions are met:

"(1) The guidelines are necessary.

"(2) The department has the authority to issue the guidelines.

"(3) The guidelines are clear and appropriately referenced to, and consistent with, existing statutes and regulations."

[13]The parties use the term "place holder" to refer to agenda items *and* to the form used to place items on the agenda.

submitted by Joseph H. Stein, Jr., who succeeded Carrabino as Board president, permitted the Board to discuss *and* act on the guidelines. However, the Board took no action to approve or disapprove proposed program guidelines during this period.

Inexplicably, agenda place holders submitted in May, June, and July 1992, indicated proposed program guidelines were presented for information only, not for Board action. Two of those place holders were submitted by Stein. Stein claims in a declaration filed with the Board's supplemental letter brief, "Because [the place holder] indicates that the department advisory item is for information only, no formal State Board action may be taken. It restricts this item to discussion and debate. Without formal State Board action, DOE does not have to act on the comments of individual State Board members. This method does not accomplish the policy's purpose or intent."

The Board president directs preparation of agendas for Board meetings in consultation with the executive committee. The Superintendent had no control over the monthly agenda place holders which restricted Board action on the program guidelines beginning in May 1992.

The record demonstrates the Superintendent complied with the executive director's February 1992 request that proposed program guidelines be submitted to the full Board for review no less than 10 days before the Board meeting. Given the Superintendent's "willingness to perform without coercion," we conclude the writ of mandate is unnecessary. (8 Witkin, Cal. Procedure, Extraordinary Writs, *supra*, § 73, p. 712.)

Moreover, the Board's ability to approve or disapprove the proposed program guidelines was limited by the Board president's discretion to set the matter for action or information only, not by any action or inaction on the part of the Superintendent. From this perspective, the issue is not ripe for judicial decision. (*Pacific Legal Foundation, supra*, 33 Cal.3d at p. 171.) It would be a different matter if the Superintendent had refused to present proposed guidelines for Board action. Accordingly, we deny the Board request for a writ of mandate to compel the Superintendent to implement Policy No. 1.

### 2. *Budget Review and Approval*

Policy No. 4 states, "It is the policy of the California State Board of Education that it shall review and approve an annual operating budget for the

State Department of Education."[14] The policy outlines the procedure to be followed by the Superintendent when submitting the Department budget to the Board. A related matter, Board oversight of the budget once approved and allocated, is addressed in other sections of this opinion.[15]

■ The Board asserts the Superintendent refused to implement Policy No. 4, thereby breaching his clear and present duty to do so. The Superintendent responds he submitted both the 1991-1992 and 1992-1993 budgets to the Board for review and action. Although the Board concedes in its supplemental brief that the 1991-1992 and 1992-1993 budgets were placed on the Board agenda, it claims the manner of presentation prevented the Board from taking any action.

The record fails to demonstrate the Superintendent's failure to comply with Policy No. 4. The Board does not show how the Superintendent's manner of presentation was inadequate, or why the Board was prevented from taking action. The budget was placed on the agenda for both information and action. If there had been serious and legitimate concerns about the manner of presentation, the Board had the option of disapproving the budget and informing the Superintendent how it was deficient. The Board did neither. Accordingly, we conclude the issue of budget review and approval is both moot—because the Board failed to rebut facts showing the Superintendent complied with Policy No. 4—and unripe—because there is no actual dispute appropriate for judicial resolution at this time.

### 3. *Continuing Budget Oversight*

The budget oversight policy, articulated in the First Memorandum and adopted by the Board in June 1991, includes a requirement the Superintendent give the Board advance notice of audit meetings, including entrance and exit conferences. It also requires him to provide the Board with monthly reports on pending litigation.[16]

The Superintendent does not object to provisions of the budget oversight policy requiring notice of audit meetings and reports on litigation, declaring the practice of providing information relating to audits and litigation will continue.

The Board's petition does not specifically allege the Superintendent refuses to comply with these portions of the budget oversight policy. Nor is

---

[14]The full text of Policy No. 4 appears in the appendix, page 774, *post.*
[15]See discussion this page and pages 763-766, *post.*
[16]The full text of the budget oversight policy appears in the appendix, page 776, *post.*

there any evidence to rebut the Superintendent's representation of compliance with the notice and reporting provisions. To the extent the question is before us, we conclude the issue is moot given the Superintendent's continuing effort to provide the Board with the requested information. We consider the Superintendent's refusal to comply with other portions of the budget oversight policy in part III.D. of this opinion.[17]

### 4. *Preparation of the Department Organizational Chart*

In October 1990, Carrabino submitted an organizational chart for approval by the Board. He stated the Department organizational chart showed the Board as an "appendage" to the Department. The Superintendent recommended the Board postpone action on the question of organizational charts until he and the Board worked out their differences. He stated that "placing the Board over the Superintendent is appropriate with regard to policy but [did] not reflect other organizational relationships." In spite of this admonition, the Board approved the revised organizational chart submitted by Carrabino.

At its March 1991 meeting, the Board resolved to direct the Superintendent "to prepare . . . organizational charts consistent with Special Counsel's legal opinion, . . ." That opinion reviewed the legality of the policies adopted by the Board at its September 1990 meeting. Special counsel affirmed the Board's legal authority as the governing and policy determining body of the Department. In raising the question of organizational charts, the Board was concerned "the State Board [had] come to be perceived by many as outside the State Department of Education chain of command."

The Superintendent responded in a letter dated July 11, 1991, stating: "On the topic of organizational charts, I do not intend to alter the current CDE [Department] chart. The current chart is consistent with all of the previous charts we have located. . . . However, if a majority of the SBE [Board] is so inclined, it surely may promulgate any chart it wishes to depict its own view of the organizational framework of the CDE."

The organizational chart issued by the Department on January 1, 1992, depicts the Board on the same level as the Superintendent with the chain of command moving horizontally from the Board to the Superintendent, and vertically from the Superintendent to the Department.

The Board fails to demonstrate the inaccuracy of the January 1, 1992, organizational chart, or the manner in which it places the Board outside the

---

[17]See discussion at pages 763-766, *post.*

chain of command. From our reading of the chart, informed solely by the record, the chain of command flows from the Board, through the Superintendent, to the Department. In the absence of more specific guidelines, we conclude nothing more is required of the Superintendent and the issue is moot.

Nor will we issue an advisory opinion based on little more than the Board's concern about the possible impact an organizational chart may have on public perception of its role. As we stated earlier, courts must focus their attention on concrete disputes fit for judicial resolution. (*Pacific Legal Foundation, supra,* 33 Cal.3d at pp. 170-171.)

### D. *Questions of Public Interest Likely to Recur*

█ The Board contends we should address the merits of claims that might otherwise be considered moot. It argues the Superintendent's voluntary efforts to accommodate the Board do not render its petition for writ of mandate moot because the misconduct may recur. (See *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833], disapproved on other grounds in *State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1168-1169 [252 Cal.Rptr. 221, 762 P.2d 385].) The Board notes the Superintendent continues to challenge the Board's view of the governance issues, and refuses to "surrender[] his own specific authority" in spite of his voluntary compliance with some of the Board's policies.

As we stated in *Cooke* v. *Superior Court, supra,* 213 Cal.App.3d at page 417, a similar argument was rejected in *George* v. *Beaty* (1927) 85 Cal.App. 525 [260 P. 386]. In *George,* petitioners sought a writ of mandate to compel the supervisors of the Los Angeles Flood Control District to proceed with construction of a dam in accordance with specifications approved by the voters in a special bond election. After the petition was filed, the board resolved to construct the dam as mandated by the voters. (*Id.* at p. 527.) Petitioners then argued the writ should issue because the board of supervisors might change its mind and adopt a new policy. The court denied the writ. It stated, "the writ of *mandamus* is in no sense a preventative . . . remedy." (*Id.* at p. 531.) The court continued, "The board of supervisors [has] taken all action which we might at this time compel them to take and we cannot assume that they will not continue [to perform]. In fact we are bound to presume, in line with the presumption contained in [Evidence Code section 664] 'that official duty' will be 'regularly performed.' " (*Id.* at pp. 528-529.) Although the rule imposed the need for "continued vigilance" on the part of petitioners, "if [the rule] were otherwise courts might be continually called upon to direct and supervise the conduct of public officials vested with ministerial powers." (*Id.* at p. 531.)

In spite of his conflicting rhetoric, we presume the Superintendent will continue to exercise good faith in complying with the Board's procedures for Board review and approval of proposed program guidelines, and Board review and approval of proposed budgets. (*Cooke* v. *Superior Court, supra*, 213 Cal.App.3d at p. 418, citing Evid. Code, § 664 ["It is presumed that official duty has been regularly performed. . . ."].) We also presume the Board will continue its vigilance to insure compliance. (See the "Rafferty Opinion," 41 Ops.Cal.Atty.Gen., *supra*, at p. 114, citing former Code Civ. Proc., § 1963, subd. 15, now Evid. Code, § 664, Stats. 1965, ch. 299, §§ 2, 110, pp. 1310, 1363.)[18]

We also reject the contention the matters we have declared moot should be resolved on their merits because they raise questions of grave public concern. We address many of the governance issues raised by the Board in other sections of this opinion. There is no need to consider those issues as they relate to Policy No. 1 and Policy No. 4 where the Superintendent's voluntary compliance makes it unnecessary to do so.

### III

#### *The Remaining Governance Issues*

Having disposed of the questions that are moot or unripe for review, we turn to four remaining issues. These include the Board's allegations the Superintendent has a clear, present, and ministerial duty to implement its policies concerning (1) nomination of deputy and associate superintendents under article IX, section 2.1 of the California Constitution; (2) allocation of additional staff to the Board, (3) continuing budget oversight, and (4) the Board's legal services contract with outside counsel. We begin by reviewing the law regarding delegation of legislative powers, a principal basis for the Superintendent's refusal to implement Board policies. Next, we address the constitutional question relating to nomination of key personnel pursuant to article IX, section 2.1 of the California Constitution. Finally, we consider whether the Board exceeded its statutory authority by adopting and seeking implementation of policies on allocation of additional staff, continuing budget oversight, and the legal services contract.

---

[18]We earlier acknowledged usefulness of the corporate analogy employed by the Attorney General in identifying the substance and structure of the relationship between the Superintendent and the Board. (See fn. 6, *ante*, p. 736.) We also noted the difficulties described in the "Rafferty Opinion" focused on the mechanics of enforcing compliance with Board directives. (See fn. 7, *ante*, p. 737.) The successful operation of this constitutional and statutory scheme depends on good faith dialogue and cooperation between the Board and Superintendent.

## A. *Delegation of Legislative Power*

■ Educational boards and administrative officers have no inherent powers—only those powers granted them by the Constitution and Legislature. Thus, the law governing educational agencies' exercise of delegated powers plays an important role in school governance. (Rapp, Education Law (1992) State Control, § 3.02[4][b], p. 3-17; Valente, Education Law: Public and Private (1985) Public Schools, § 2.3, p. 17.) We begin by reviewing legal principles applicable to legislative delegation of power to administrative agencies.

Essentials of the legislative function include the determination and formulation of legislative policy. "Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the 'power to fill up the details' by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect, . . ." (*First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 549 [159 P.2d 921].) In the educational setting, legislatures rarely control public school operations directly, but delegate authority which permits state, regional, and local education agencies to establish school policies and practices. (Rapp, Education Law, *supra*, § 3.02[4][b], p. 3-17; Valente, Education Law: Public and Private, *supra*, § 2.3, p. 17.)

■ However, administrative regulations may not exceed the scope of authority conferred by the Legislature. (See *Hartzell* v. *Connell* (1984) 35 Cal.3d 899, 914 [201 Cal.Rptr. 601, 679 P.2d 35]; *Comite de Padres de Familia* v. *Honig* (1987) 192 Cal.App.3d 528, 532-533 [237 Cal.Rptr. 517].) "An unconstitutional delegation of legislative power occurs when the Legislature confers upon an administrative agency unrestricted authority to make fundamental policy decisions." (*People* v. *Wright* (1982) 30 Cal.3d 705, 712 [180 Cal.Rptr. 196, 639 P.2d 267].) " 'This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions.' " (*Ibid.*, quoting *Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].)

Practical necessity limits strict enforcement of the nondelegation doctrine. The California Supreme Court recognized as early as 1917 "that legislative bodies have neither the resources nor the expertise to deal adequately with

every minor question potentially within their jurisdiction. 'Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs—national, state, and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are intrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all . . . .' " (*Kugler* v. *Yocum, supra,* 69 Cal.2d at pp. 383-384, quoting *Gaylord* v. *City of Pasadena* (1917) 175 Cal. 433, 436 [166 P. 348]; see also Davis, Administrative Law Treatise (1978) Delegation and Subdelegation, § 3:3, pp. 152-157; and Rapp, Education Law, *supra,* § 3.02[4][b], p. 3-17.)

 ■ Citing *Hartzell* v. *Connell, supra,* 35 Cal.3d 899, the Board contends it may make rules and regulations on any topic reasonably related to its policymaking role so long as there is no express statute to the contrary. The Superintendent asserts the Board may not adopt rules and regulations on a particular topic without express statutory authority to do so. The proper rule lies between these two extremes.

 ■ The nondelegation doctrine does not invalidate reasonable grants of power to an administrative agency as long as there are adequate safeguards to protect against misuse of that power. However, the standards to guide adoption of administrative rules and regulations need not be expressly set forth in the authorizing statute. (*People* v. *Wright, supra,* 30 Cal.3d at pp. 712-713.) They may be implied from the statutory purpose (*id.* at p. 713; *Wilkinson* v. *Madera Community Hospital* (1983) 144 Cal.App.3d 436, 442-443 [192 Cal.Rptr. 593]) or related statutes (*Cal. State Auto etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 906-907 [216 P.2d 882]). More stringent and specific standards are required only where necessary to prevent abuse, for example, in cases in which representatives from private industry serve on administrative boards with power to make rules affecting board members' competitors. (See *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29]; and *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1 [97 Cal.Rptr. 431].)[19]

 ■ Once we determine the scope of quasi-legislative power delegated to the Board, we may turn to the question whether the Board exceeded the

---

[19]Our decision in *Comite de Padres de Familia* v. *Honig, supra,* 192 Cal.App.3d 528, is not inconsistent with the principles we express here. *Comite* was an unusual case in which plaintiffs argued a statute requiring the Board and Superintendent to "assist" local school

scope of that power when it adopted the challenged policies. In this connection, our sole function is to determine " 'whether the [Board] reasonably interpreted the legislative mandate.' " (*Hartzell* v. *Connell, supra,* 35 Cal.3d at p. 914.) Specifically, we must determine whether the agency regulations are consistent, not in conflict with the statutory scheme, and reasonably necessary to effectuate its purpose. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 678 [94 Cal.Rptr. 279, 483 P.2d 1231].) " 'Such a limited scope of review constitutes no judicial interference with the administrative discretion in that aspect of the rulemaking function which requires a high degree of technical skill and expertise. [Citation.] Correspondingly, *there is no agency discretion to promulgate a regulation which is inconsistent with the governing statute.'* " (*Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816 [201 Cal.Rptr. 165, 678 P.2d 378], quoting *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032, italics added in *Ontario*].) Because policies adopted by the Board come before the court with a presumption of correctness and regularity, the burden of demonstrating invalidity is placed upon the Superintendent. (*Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993]; Evid. Code, § 664.)

Before considering the remaining four policies challenged by the Superintendent, we set forth the constitutional provisions which define legislative powers relating to education, and the statutes under which the Legislature delegates specific powers to the Board and Superintendent. In construing these provisions in the sections which follow, we apply familiar principles. ■■■ " '[W]e begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] 'An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' [Citations.] Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. [Citations.]" (*California Teachers Assn.* v. *San Diego Community College Dist.*

districts in adopting, implementing, and maintaining affirmative action employment programs gave rise to an implied duty to "monitor" and "enforce" compliance with those programs. We rejected plaintiffs' argument we should imply a duty of enforcement from the fact the Department and Board had ultimate responsibility in matters of education pursuant to article IX of the California Constitution and sections 33031, and 33111-33113. (192 Cal.App.3d at p. 533.) We declined to involve ourselves "in the forbidden function of legislating." (*Ibid.*) We concluded "[t]he Legislature prescribes the authority to be exercised by defendants and the manner in which this authority is exercised is a matter of administrative discretion beyond our power to direct or control." (*Ibid.*) In *Comite,* the authorizing statute expressly limited the scope of Department regulations to providing "assistance" to local school districts. The statutory scheme provided no basis on which to imply the Board and Superintendent had a duty to "monitor" or "enforce" affirmative action programs, and defendants would have exceeded the authority granted by the Legislature in attempting to do so.

(1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) "If the words, given their ordinary and popular meaning, are reasonably free from uncertainty there is no need for construction, and we may not indulge in it. [Citations.]" (*Comite de Padres de Familia* v. *Honig, supra,* 192 Cal.App.3d at p. 532.) These principles recognize that courts " ' "must follow the language used and give to it its plain meaning, whatever may be thought of the wisdom, expediency, or policy of the act, even if it appears probable that a different object was in the mind of the legislature." ' " (*People* v. *Weidert* (1985) 39 Cal.3d 836, 843 [218 Cal.Rptr. 57, 705 P.2d 380], quoting *Woodmansee* v. *Lowery* (1959) 167 Cal.App.2d 645, 652 [334 P.2d 991].)

Article IX, section 1 of the California Constitution sets forth broad legislative policy on education: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." Section 5 states the Legislature shall provide for a system of common and free schools. The Constitution also outlines the manner by which the Legislature shall apportion funds to operate public schools. (Cal. Const., art. IX, § 6.)

The Legislature, in turn, delegated certain powers to the Board and Superintendent. Pursuant to section 33030, "[t]he board shall determine all questions of policy within its powers." The Board is authorized to "adopt rules and regulations not inconsistent with the laws of this state (a) for its own government, (b) for the government of its appointees and employees," and the government of the various schools which receive state funds. (§ 33031.)

The Legislature delegated to the Superintendent the power to "execute, under direction of the State Board of Education, the policies which have been decided upon by the board and shall direct, under general rules and regulations adopted by the State Board of Education, the work of all appointees and employees of the board." (§ 33111.)

As we have stated, section 33301 describes how the appointed Board and elected Superintendent should divide responsibilities for administration of the Department: "The Department of Education shall be administered through: [¶] (a) The State Board of Education which shall be the governing and policy determining body of the department; [¶] (b) The Director of Education [Superintendent] in whom all executive and administrative functions of the department are vested and who is the executive officer of the State Board of Education." Other statutes contain more specific grants of legislative power which we shall discuss where relevant.

At oral argument, the Superintendent raised for the first time a constitutional challenge to the Legislature's designation of the Board as "the governing and policy determining body of the department." (§ 33301, subd. (a).) He argues the framers of the 1879 Constitution intended to place the Superintendent "in charge and control of the public school system and the state education department." We requested supplemental briefing. The parties agree the constitutional question raises important public policy issues which are properly before us.

We recently described the Legislature's power over the public school system as "exclusive, plenary, absolute, entire, and comprehensive, subject only to constitutional constraints." (*California Teachers Assn.* v. *Huff* (1992) 5 Cal.App.4th 1513, 1524 [7 Cal.Rptr.2d 699], citing *Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 180-181 [302 P.2d 574], *Pass School Dist.* v. *Hollywood Dist.* (1909) 156 Cal. 416, 418 [105 P. 122], *San Carlos Sch. Dist.* v. *State Bd. of Education* (1968) 258 Cal.App.2d 317, 324 [65 Cal.Rptr. 711], and *Town of Atherton* v. *Superior Court* (1958) 159 Cal.App.2d 417, 421 [324 P.2d 328]; accord, *Butt* v. *State of California* (1992) 4 Cal.4th 668, 681 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) The Superintendent agrees the Legislature's authority in education matters is plenary.[20] He nonetheless argues this case is different from *Huff* and other cases which have applied the classic formulation of legislative power.

The Superintendent directs our attention to article IX, section 2 of the California Constitution which states: "A Superintendent of Public Instruction shall be elected by the qualified electors of the State at each gubernatorial election. The Superintendent of Public Instruction shall enter upon the duties of the office on the first Monday after the first day of January next succeeding each gubernatorial election. No Superintendent of Public Instruction may serve more than 2 terms."[21] Focusing on the language "shall enter upon the duties of the office" and on portions of the debates of the 1878-1879 Constitutional Convention, the Superintendent asserts article

[20]Counsel for the Superintendent declared at oral argument, "We absolutely agree that the Legislature has the ability to give definition to anything in the Constitution."

[21]As we stated, the constitutional language which provides for election of the Superintendent first appeared in the 1849 Constitution. Article IX, section 1, read: "The legislature shall provide for the election, by the people, of a superintendent of public instruction, who shall hold his office for three years, and *whose duties shall be prescribed by law*, and who shall receive such compensation as the legislature may direct." (Italics added.)

The 1879 Constitution included the provision in roughly its present form. Article IX, section 2, provided: "A Superintendent of Public Instruction shall, at each gubernatorial election after the adoption of this Constitution, be elected by the qualified electors of the State. He shall receive a salary equal to that of the Secretary of State, and *shall enter upon the duties of his office* on the first Monday after the first day of January next succeeding his election." (Italics added.)

IX, section 2 limits the Legislature's plenary authority to define the Superintendent's duties. We reject the argument.

The Superintendent emphasizes that by 1872, the Legislature had already set forth in the Political Code the duties of the Superintendent and ex officio Board. He asserts, "It was against this background that the delegates to the 1878-1879 Constitutional Convention began a lengthy debate on proposed section two of article IX . . . ." (Fn. omitted.) The Superintendent quotes at length from the debate surrounding unsuccessful amendments to replace the Superintendent with an elected State Board of Education, reduce the Superintendent's salary, and prohibit state expenditures for his staff. He then says the delegates' acceptance of article IX, section 2, and their rejection of proposed amendments "show that article IX, section 2 operates as both a 'constitutional constraint upon' as well as an express denial of legislative authority to enact any statute which either 1) reduces the Superintendent's general duty to [be] head of the Department of Education or 2) impedes his general duty to superintend/lead the public school system of the state." Thus, although article IX, section 2 does not expressly enumerate the Superintendent's duties, he concludes section 33301, subdivision (a), is unconstitutional because it contradicts the delegates' understanding of those duties.

Our analysis of these constitutional issues is guided by well-established rules of constitutional construction in addition to the principles of statutory construction we have already described. ▮ " ' "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers *which are not expressly, or by necessary implication denied to it by the Constitution.* . . . [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. *Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.'* " ' " (*California Teachers Assn.* v. *Huff, supra,* 5 Cal.App.4th at pp. 1531-1532, quoting *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215], italics in original.)

▮ Moreover, there is a strong presumption in favor of the Legislature's interpretation of the Constitution. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161].) " '[W]here

a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. . . . [A]nd the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution.' " (*Ibid.*, quoting *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].)

 We find nothing in the plain language of article IX, section 2 which limits the Legislature's plenary authority. The Superintendent's "duties" are not defined in article IX, section 2. Indeed, the Legislature has supplied the necessary definition since the Constitution of 1849 stated the Superintendent's duties "shall be prescribed by law, . . ." As the Superintendent notes, when the 1879 Constitution was adopted, the only duties of the Superintendent were the statutory duties set forth in Political Code section 1532. Furthermore, there is nothing in the cited debates to suggest the delegates intended to diminish the Legislature's existing plenary power over the duties of the Superintendent.

Nor does a commonsense reading of the language the Superintendent "shall enter upon the duties of the office" create a right to take charge of and be in control of the public school system and the Department by virtue of that office alone. Our reading of article IX, section 2 is consistent with article IX considered as a whole. (See *Fields* v. *Eu* (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729].) Although the Superintendent is a constitutional officer whose office cannot be extinguished by the Legislature, the powers and duties of that office may, and have been, increased and diminished by the Legislature under its plenary authority.

Having rejected the Superintendent's constitutional challenge, we turn to the remaining governance issues.

B. *Nomination of Deputy and Associate Superintendents*

Article IX, section 2.1 of the California Constitution provides: "The State Board of Education, on nomination of the Superintendent of Public Instruction, shall appoint one Deputy Superintendent of Public Instruction and three Associate Superintendents of Public Instruction who shall be exempt from State civil service and whose terms of office shall be four years. [¶] This section shall not be construed as prohibiting the appointment, in accordance with law, of additional Associate Superintendents of Public Instruction subject to State civil service."

In addition to nominating one deputy and three associate superintendents for appointment by the Board under article IX, section 2.1 of the California Constitution, the Superintendent is authorized to appoint, or nominate for appointment by the Governor, up to eight deputy and associate superintendents who are also exempt from civil service. The Superintendent may appoint one deputy and one associate superintendent pursuant to article VII, section 4, subdivision (c) of the California Constitution,[22] and recommend three deputy superintendents and three associate superintendents for appointment by the Governor pursuant to article VII, section 4, subdivision (f) of the California Constitution and section 33143.[23] The Superintendent may also appoint additional deputy and associate superintendents through civil service or make temporary assignments under Government Code section 19050.8.[24] Thus, the Superintendent is authorized by constitutional and statutory law to nominate or appoint at least *12* key personnel for the Department.

However, in 1983, the Legislature limited the total number of deputy and associate superintendents to *eight*, that is, the number of those positions funded in the 1982-1983 General Fund Budget. (Stats. 1983, First Ex. Sess. 1982, ch. 3, § 2, p. 5529.) The Superintendent has made appointments and nominations pursuant to article VII, section 4, subdivision (c), and article VII, section 4, subdivision (f) of the California Constitution and Government Code section 19050.8, but there are currently no appointments under article IX, section 2.1 of the California Constitution. Furthermore, the parties agree in their supplemental briefs there are, at present, no budgeted and unfilled positions for deputy superintendent or associate superintendent.

 Policy No. 2 restates the Board's authority to appoint one deputy and three associate superintendents under article IX, section 2.1 of the

[22]Article VII, section 4, subdivision (c) of the California Constitution provides: "The following are exempt from civil service: [¶] . . . [¶] (c) Officers elected by the people and a deputy and an employee selected by each elected officer."

[23]Article VII, section 4, subdivision (f) of the California Constitution provides: "The following are exempt from civil service: [¶] . . . [¶] (f) State officers directly appointed by the Governor with or without the consent or confirmation of the Senate . . . ."

Section 33143 reads: "*In addition to* the positions authorized by Section 2.1 of Article IX of the California Constitution, the Governor, with the recommendation of the Superintendent of Public Instruction, shall appoint three deputy superintendents of public instruction and three associate superintendents of public instruction who shall be exempt from state civil service." (Italics added.)

[24]Government Code section 19050.8 reads in part:

"The [State Personnel Board] may prescribe rules governing the temporary assignment or loan of employees within an agency or between agencies for not to exceed two years or between jurisdictions for not to exceed four years for any of the following purposes:

"(a) To provide training to employees.

"(b) To enable an agency to obtain expertise needed to meet a compelling program or management need.

"(c) To facilitate the return of injured employees to work. . . ."

California Constitution, outlines a timetable for nominations by the Superintendent, and provides for interim appointments by the Board.[25] The Board asserts the Superintendent has a clear and present duty to implement Policy No. 2 by nominating one deputy superintendent and three associate superintendents for appointment by the Board. In support of its argument, the Board cites article I, section 26 of the California Constitution which reads: "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."

Given the Legislature's limitation on the total number of exempt appointments, we must decide whether the Superintendent is required to submit the article IX, section 2.1 nominations before appointing or recommending individuals for appointment pursuant to article VII, section 4 of the California Constitution. To answer this question, we apply established rules of statutory construction to the relevant constitutional provisions. (*State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 823 [164 Cal.Rptr. 739].)

 "Constitutional provisions adopted by the People are to be interpreted so as to effectuate the voters' intent, and if the intent is clear from the language used, there is no room for further judicial interpretation." (*People* v. *Taylor* (1986) 180 Cal.App.3d 622, 631 [225 Cal.Rptr. 733].) The language of article IX, section 2.1 of the California Constitution is framed in terms of the Board's *mandatory* duty to appoint one deputy and three associate superintendents "on nomination" by the Superintendent. Under section 2.1, the Superintendent is under no similar mandatory duty to submit nominations.

However, the Board is authorized under section 33031 to "adopt rules and regulations . . . for its own government" and "for the government of its appointees . . . ." The Superintendent must execute policies decided by the Board. (§ 33111.) Accordingly, the Board may, pursuant to its statutory authority, direct the Superintendent to nominate one deputy superintendent and three associate superintendents under article IX, section 2.1 of the California Constitution to enable the Board to carry out its constitutional mandate.

We also conclude the Superintendent is required to submit the article IX, section 2.1 nominations for appointment by the Board before submitting recommendations for appointment by the Governor pursuant to article VII, section 4, subdivision (f) of the California Constitution and section 33143. Here the seeming conflict between constitutional provisions is reconciled by

---

[25]The text of Policy No. 2 appears in the appendix at pages 773-774, *post.*

a second principle of statutory construction. ■ "[I]f it is impossible to harmonize or reconcile portions of a constitution, special provisions control more general provisions, and the general and special provisions operate together, neither working the repeal of the other." (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723].)

■ Article IX, section 2.1 of the California Constitution designates a specific number of named exempt positions to be appointed by the Board. In contrast, article VII, section 4, subdivision (f) merely lists general categories of exempt positions directly appointed by the Governor.[26] Specifics as to numbers and position titles are supplied by the *statutory* language of section 33143. Indeed, section 33143 indicates these six appointments are "[*i*]*n addition to* the positions authorized by Section 2.1 of Article IX . . . ." (Italics added.)

A writ of mandate shall issue directing the Superintendent to implement Policy No. 2 by submitting the required nominations under article IX, section 2.1 of the California Constitution.

C. *Request for Additional Staff*

The Department provides the Board with staff who serve under the direction and control of the Superintendent. Board staff currently consists of an executive director and three secretaries. The Department had a total of more than 1,400 budgeted staff positions in the 1991-1992 fiscal year. (Little Hoover Com., Costs and Casualties of K-12 Education in Cal. (June 1991) p. 22.)

In 1990, the Board worked with the Governor's office and the Department of Finance in an unsuccessful attempt to secure a funding for one additional staff position. The Superintendent opposed the augmentation at budget hearings before the Legislature.

During the fall of 1991, the Board approved a budget change proposal (BCP) to add one staff position to the Department's 1992-1993 budget. The Department of Finance rejected the request.

Policy No. 5, adopted by the Board in September 1990, represents the Board's effort to increase to eight the number of support staff supplied by

---

[26]Article VII, section 4, subdivision (c) of the California Constitution is different. It names a general category of exempt positions to include elected officers and their appointees, but specifically limits the number of appointees to "a deputy and an employee selected by each elected officer."

the Department. The policy states: "It is the policy of the California State Board of Education that it shall adopt for the following fiscal year, an annual budget for the operation of the Board at its September meeting. Pursuant to Education Code §§ 33111 and 33330, the budget shall be administered by the [Superintendent], in consultation with the Executive Director. The budget shall include sufficient resources so the Board can . . . (4) maintain a Board office in Sacramento, staffed by one Executive Director, one Senior Staff Counsel, one Associate Governmental Program Analyst, one Administrative Assistant, one Executive Secretary, and three Secretaries. The Board's staff employees . . . shall be funded by the [Department] . . . . [¶] Procedure: The following procedures shall be utilized to develop the Board's annual operating budget and program of work: [¶] . . . [¶] 6. The Superintendent of Public Instruction shall include the Board's budget in the form adopted by the Board at its September meeting [on] the Department's budget, and shall work with the Executive Director in securing funding from the Governor and Legislature to implement the program of work for the next fiscal year." The Board also amended its bylaws to authorize the Board to appoint the additional staff it requested.[27]

The Superintendent refuses to implement Policy No. 5 and provide the additional staff requested by the Board on the grounds: (1) he is reserving discretion to determine staffing needs within the Department; and (2) Policy No. 5 transgresses his delegated authority to administer the Department under sections 33110, 33111, and 33140.[28] The Superintendent views the Board action as an unauthorized attempt to usurp his appointing power by adopting a "policy" which purports to give the Board authority to appoint and direct the work of eight Department employees. Thus, he argues he is under no clear, present, ministerial duty to implement Policy No. 5. We address Policy No. 5 before considering the related bylaws amendment.

[27]The full text of Policy No. 5 and the amended bylaws appears in the appendix at page 775, *post*.

[28]Sections 33110 and 33111 relate to the powers and duties of the Superintendent. Section 33110 provides:

"The Superintendent of Public Instruction may employ one Deputy Superintendent of Public Instruction and necessary clerical and expert assistants, and may fix the compensation of all statutory and other employees as provided by law, except as otherwise provided."

Section 33111 states:

"The Superintendent of Public Instruction shall execute, under direction of the State Board of Education, the policies which have been decided upon by the board and shall direct, under general rules and regulations adopted by the State Board of Education, the work of all appointees and employees of the board."

Section 33140 outlines the duties of deputy and associate superintendents and states:

"The duties of the Deputy Superintendent of Public Instruction and of the associate superintendents of public instruction appointed by the State Board of Education under Section 2.1 of Article IX of the Constitution of this state shall be such as are assigned to them by the Superintendent of Public Instruction."

As we stated, the Board is authorized to adopt rules and regulations for its own government which are not inconsistent with state law. (§ 33031.) A Board policy which articulates the need for adequate space and staff, and provides a procedure for adoption of the Board's annual budget, is consistent with section 33031. Policy No. 5 also provides an orderly way to fund additional staff positions for the Board. The policy is not inconsistent with sections 33110, 33111, or 33140.

Policy No. 5 recognizes the need for cooperation between the Board, its executive director, and the Superintendent in order to secure funding for Board staff. Given the history of the relationship between the Board and the Superintendent, we find these procedures reasonably necessary to permit the Board to function effectively as "the governing and policy determining body of the department." (§ 33301, subd. (a).) Accordingly, we conclude the Board reasonably interpreted its legislative mandate when it adopted Policy No. 5. (*Hartzell* v. *Connell, supra,* 35 Cal.3d at p. 914.)

Our reading of Policy No. 5 leaves no doubt the Board intended its budget to be an integral part of the Department budget, not a mere appendage. Thus, cooperation with the Board's executive director "in securing funding from the Governor and Legislature to implement the [Board's] program of work," involves the Superintendent's active support of the Board's budget requests. Inclusion of additional Board staff in the Department budget may also require the Superintendent to reduce the number of Department employees in order to meet the Board's personnel requirements, or to redirect funding from other areas in order to accommodate the Board's needs. We distinguish these facts from those presented in the "Rafferty Opinion," where the Board and Superintendent took opposing positions on legislation relating to education.

In *Rafferty*, the Attorney General concluded, "The State Board of Education may require the Superintendent of Public Instruction to make known to the Legislature the board's opposition to specific legislation. The Superintendent of Public Instruction may not properly refuse to execute this order solely because such order may be contrary to his own personal beliefs and wishes." (41 Ops.Cal.Atty.Gen., *supra,* at p. 106.) The Board's views could be expressed by the Superintendent personally or by other Department personnel. (*Id.* at p. 114.) The Attorney General also concluded the Superintendent "may properly express to the people and the Legislature his own views as Superintendent of Public Instruction on various educational matters, including the legislation in question." (*Ibid.*)

Here, where the internal matter of a Department budget is involved, the Board and Superintendent must speak with one voice. The Legislature

established a unified Department of Education in 1921. (Stats. 1921, ch. 605, § 1, pp. 1033-1035.) In 1929, it enacted a School Code which designated the Board as the "governing and policy determining body of the department." (Stats. 1929, ch. 162, p. 303.) These legislative efforts at unification would be futile if the Superintendent were permitted to submit a budget which did not include positions required by the Board in order to fulfill its constitutional and statutory duties.

■ A closer question is presented by the amended bylaws, which authorize the Board rather than the Superintendent to appoint additional Board staff once the budget is enacted. Neither the Constitution nor the Education Code expressly authorizes the Board to appoint its own staff.

Section 33110 permits the Superintendent to employ "necessary clerical and expert assistants" but does not state he is the sole appointing authority. As executive and administrative head of the Department of Education, the Superintendent supervises the work of all appointees, including those appointed by the Board. (§§ 33111, 33140, 33301.)

However, as the Attorney General concluded in the "Rafferty Decision," "the ultimate governing and policy making body for the department and its officers and employees (including the deputy and associate superintendents of public instruction appointed pursuant to section 2.1 of Article IX of the Constitution[)] is the State Board of Education. Without ultimate control over the conduct of the officers and employees of the Department of Education, the State Board of Education cannot insure the implementation of its policies." (41 Ops.Cal.Atty.Gen., *supra*, at p. 111.)

Primary among the Superintendent's duties is the requirement to "direct, *under general rules and regulations adopted by the State Board of Education*, the work of all appointees and employees of the board." (§ 33111, italics added.) Nowhere are Board appointees limited to those authorized under article IX, section 2.1 of the California Constitution. Moreover, section 33331 authorizes the Department to expend funds to support the Board.[29] Read together, the language of these provisions leaves no doubt the Legislature intended the Board to have its own appointees and employees who would be funded by the Department.

Having considered the express language of section 33111 and related statutes, we conclude the Board reasonably interpreted the scope of its delegated power when approving the amended bylaws. (*Hartzell* v. *Connell,*

[29]Section 33331 provides: "The Department of Education may expend the moneys in any appropriation heretofore or hereafter made for the support of the State Board of Education."

*supra,* 35 Cal.3d at p. 914.) The amended bylaws are consistent with the statutory scheme. (*Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 678.) The Board's power to appoint its staff is not inconsistent with the Superintendent's supervisory responsibilities with respect to all Board appointees. (*Ibid.*) There is nothing in the record to indicate who appointed current Board staff. Nor is there anything to suggest the Board's effectiveness was inhibited or enhanced because the employees were appointed by one party or the other. However, we find the Board's assertion of power to appoint its own staff reasonably necessary to effectuate its role as the governing and policy-determining body for the Department. (*Ibid.*)

Accordingly, a writ of mandate shall issue directing the Superintendent to implement Policy No. 5 by (1) including in the Department's budget the Board's budget in the form adopted by the Board at its September meeting, and (2) working with the executive director to secure funding to implement the Board's program of work for the next fiscal year. The Superintendent is also directed to implement the amended bylaws to enable the Board to appoint additional staff when the budget is enacted.

### D. *Continuing Budget Oversight*

We have already rejected as both moot and unripe the question whether the Superintendent must implement the budget review and approval provisions of Policy No. 4 and the budget oversight policy regarding litigation and audits. We now consider whether the Superintendent is required to implement the remaining provisions of the continuing budget oversight policy approved by the Board in June 1991. To resolve this question, we must decide where the Board's policymaking responsibilities end and the Superintendent's administrative responsibilities begin. "Bright-line" rules are helpful in guiding individual action particularly where, as here, there is a history of conflict over where the line should be drawn. Although we are unable to fashion a "bright line" between policy and administration applicable in every context, we nonetheless provide guidelines for distinguishing between the two functions. Our efforts are assisted by the statutory language.

The remaining budget oversight provisions involve personal service contracts, line item transfers, and staff performance and appointment. The budget oversight policy "[g]enerally . . . requires the Superintendent to obtain State Board approval prior to transferring an amount over $10,000 in any line item in any Department unit budget. The Superintendent also would be required to submit all Department personal services contracts in excess of $20,000 to the State Board for approval and have the State Board review

those contracts prior to the issuance of the final withholding payment. In addition, the Superintendent would be required to seek approval from the State Board to enter into personal services contracts less than $20,000 if the total amount of all Department contracts to the individual exceeds $20,000. . . . The State Board may, upon request, review the performance and evaluations of Department deputy superintendents, associate superintendents, division directors and exempt appointments. . . ."[30]

■ The Board maintains the budget oversight policy is within the scope of its general power to "determine all questions of policy within its powers," including the powers impliedly conferred by virtue of its position as "the governing and policy determining body of the department." (§§ 33030, 33301, subd. (a).) It argues the Department budget implements Board policy, and asserts the budget oversight provisions are necessary to achieve policy objectives and insure efficient use of Department funds. The Board contends the policy does not contradict the Superintendent's statutory authority, but "simply adds another step to the Department's budgetary process."

The Superintendent argues he is under no clear, present, ministerial duty to implement the budget oversight policy with respect to personal service contracts, line item transfers, and staff performance and evaluations. He says these aspects of the budget oversight policy conflict with: (1) the Superintendent's authority to administer and control the Department pursuant to sections 33301, subdivision (b), and 33303; (2) specific statutory powers delegated to the Department of General Services; and (3) historical administrative practice.

Whether statutory power to approve contracts is granted exclusively to the Department of General Services is irrelevant to our examination of these issues because Government Code section 14615 and Public Contract Code section 10295[31] apply equally to the Board and Superintendent. ■ Historical administrative practice, though entitled to great respect in statutory construction, is not controlling where the practice is clearly erroneous or unauthorized. (*Steelgard, Inc.* v. *Jannsen* (1985) 171 Cal.App.3d 79,

---

[30]The full text of the budget oversight provisions appears in the appendix, page 776, *post.*

[31]Government Code section 14615 states the Department of General Services "has general powers of supervision over all matters concerning the financial and business policies of the state in regard to the duties, powers, responsibilities, and jurisdiction specifically vested in the department."

Public Contract Code section 10295 requires "[a]ll contracts entered into by any state agency for . . . (b) services, whether or not the services . . . are performed by an independent contractor, . . . are void unless and until approved by the [Department of General Services]."

88 [217 Cal.Rptr. 152].) In other words, historical practice may be wrong. (See *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 29 [160 Cal.Rptr. 710, 603 P.2d 1306]; see also *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935], and *Engelmann* v. *State Bd. of Education* (1991) 2 Cal.App.4th 47, 57 [3 Cal.Rptr.2d 264].) ▆▆▆ Thus, the pivotal question in determining whether the Superintendent is legally mandated to act in a specific manner is the scope of constitutional and statutory authority granted to the Board and Superintendent.

Before turning to the remaining provisions of the budget oversight policy, we focus for a moment on the language of section 33301, and conclude the Legislature clearly envisioned a Department administered jointly by the Board and Superintendent. (See *Comite de Padres de Familia* v. *Honig, supra,* 192 Cal.App.3d at p. 532.) Section 33301 delineates the Board's function as the "governing and policy determining body of the department," and the Superintendent as the person "in whom all executive and administrative functions of the department are vested."[32]

▆▆▆ The verb "to govern" means "to direct and control, rule, or regulate, by authority." (Black's Law Dict. (5th ed. 1979) p. 625, col. 2.) It is also defined as "[r]ule, pilot, *administer, supervise,* lead, *manage,* head, dictate, command, reign, dominate, wield power, regulate, guide, steer, *superintend.*" (West's Legal Thesaurus/Dict. (1985) p. 352, italics added.) Some aspects of "governing" implicate supervision and administration.

"To make policy" is to establish the "general principles by which a government is guided in its management of public affairs, . . ." (Black's Law Dict., *supra,* p. 1041, col. 2.) More specifically, policymaking involves the creation of "[g]uidelines, goals, objectives, system, code, custom, plan of action, course of action, methodology, platform, approach, tenets, creed, beliefs, directions, scheme, habit, tactic, style, management, design, strategy, line, polity, proposal, protocol." (West's Legal Thesaurus/Dict., *supra,* p. 583.)

By contrast, "[i]n public law, the administration of government means the *practical management* and direction of the executive department, or of the public machinery or functions, or of the operations of the various organs or agencies." (Italics added, Black's Law Dict., *supra,* p. 41.) Administration involves "[d]irection, superintendence, execution, *oversight,* supervision, regulation, control, care, conduct, performance of duty, dispensation, ministration, handling, guardianship, settlement, government." (West's Legal Thesaurus/Dictionary, *supra,* p. 26, italics added.)

---

[32]See footnotes 6, 7, and 18 at pages 736, 737, and 749, *ante.*

We conclude the Legislature intended the Board to establish goals affecting public education in California, principles to guide the operations of the Department, and approaches for achieving the stated goals. Its role as "the governing . . . body of the department" (§ 33301, subd. (a)) refers to governance in the broad sense by virtue of its policymaking authority. The Legislature did not intend the Board to involve itself in "micro-management." Thus, its responsibility to "direct and control" the Department (Black's Law Dict., *supra*, p. 625) necessarily involves *general* program and budget oversight as a means of monitoring the effectiveness of its policies.

By contrast, the Legislature intended the Superintendent to be involved in "the practical management and direction of the executive department." (Black's Law Dict., *supra*, p. 41.) In this role, the Superintendent is responsible for day-to-day execution of Board policies, supervision of staff, and more detailed aspects of program and budget oversight.

The Attorney General reached a similar conclusion in the "Rafferty Opinion." He declared the statutory scheme demonstrated "that the Legislature has made it clear that *the ultimate governing and policy making body* for the department and its officers and employees . . . is the Board of Education. Without *ultimate control* over the conduct of the officers and employees of the Department of Education, the State Board of Education cannot insure the implementation of its policies." (41 Ops.Cal.Atty.Gen., *supra*, at p. 111, italics added.) The difference between ultimate control and "micro-management" is particularly relevant to the question of budget oversight.

### 1. *Prior Approval of Personal Service Contracts*

Based on this reading of section 33301, our consideration of the statutory scheme affecting governance of the Department, we conclude the Superintendent has no duty to implement the budget oversight provisions regarding prior approval of personal service contracts.

Although sections 33030 and 33301 confer broad, policymaking authority on the Board, neither they nor any other statute grants the Board express authority to approve Department contracts. As we stated earlier, the lack of an express statutory delegation of power is not fatal where such delegation of authority may be implied from the statutory purpose or related statutes. (*People* v. *Wright, supra*, 30 Cal.3d at pp. 712-713; *Cal. State Auto etc. Bureau* v. *Downey, supra*, 96 Cal.App.2d at pp. 906-907.) Here, however, related statutes expressly grant the Superintendent power to "employ . . . necessary clerical and expert assistants" and "fix the compensation of all statutory and other employees as provided by law, except as otherwise provided." (§ 33110.)

The Board suggests the budget oversight provisions simply add a step to the Department's internal approval process. However, the Board concedes the Superintendent is responsible for executing and administering the budget once it is approved. We conclude the requirement of prior Board approval of personal services contracts is inconsistent with the statutory scheme granting the Superintendent administrative and executive authority, and is outside the scope of the Board's general responsibilities for program and budget oversight. (*Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 678.)

### 2. *Line Item Transfers*

The parties do not specifically address the question whether the Board has authority to require prior approval of all budget line item transfers over $10,000. We presume the Board again relies on the general powers conferred by sections 33030 and 33301, subdivision (a). Given the language of section 33301, we conclude this portion of the budget oversight policy involves the Board in detailed day-to-day administration of the Department budget, and is therefore inconsistent with the Legislature's grant of executive and administrative authority to the Superintendent. It is the Superintendent's job to administer the budget. As a general proposition, line item transfers are traditionally an administrative prerogative. It may be there are some line item transfers so significant that they affect policy in a meaningful way. This record does not demonstrate the line items at issue were of such a character. Accordingly, we decline to compel the Superintendent to implement this portion of the budget oversight policy.

### 3. *Staff Performance and Appointment*

In part III. C. of this opinion, we discussed the Board's and Superintendent's respective authority to appoint and supervise staff as it related to the Board's request for additional staff.[33] Here, the budget oversight policy provides, "The [Superintendent] shall *review* with the Board at its request, but in no case less frequently than annually, in executive session if appropriate, the performance and evaluations of [Department] deputy superintendents, associate superintendents, exempt appointments and Division Directors in the Department." (Italics added.)

We conclude the Board is authorized to review the performance of key personnel on an annual basis. There is nothing in the challenged policy to suggest the Board is asserting the power to take action with respect to Department staff, a matter clearly within the administrative purview of the Superintendent. The Board does not have direct control over the conduct of

---

[33]See discussion at pages 759-763, *ante.*

the Department's officers and employees. The Board's control is exercised indirectly through the rules and regulations it adopts. (The "Rafferty Opinion," 41 Ops.Cal.Atty.Gen., *supra*, at p. 113.) As we stated, however, the Board's role as "the governing . . . body of the department" (§ 33301, subd. (a)), involves general program and budget oversight. The policy authorizing periodic *review* of performance evaluations for key personnel is consistent with the statutory scheme and reasonably necessary to effectuate the statutory purpose. (*Mooney* v. *Pickett, supra*, 4 Cal.3d at p. 678.)

A writ of mandate shall issue directing the Superintendent to implement the portion of the budget oversight policy which provides for periodic review of the performance evaluations of deputy superintendents, associate superintendents, exempt appointments, and division directors.

### E. Legal Services Contract

After the Board reaffirmed its rejection of Dickstein's Second Memorandum in April 1991, it decided to pursue independent counsel "for the purpose of seeking declaratory relief . . . to clarify the governance and authority of the Board and the Superintendent." The Superintendent cautioned it was premature for the Board to hire legal counsel absent a specific conflict. Carrabino asked how the Board could secure funding for outside counsel. The Superintendent responded that "the Board must send a formal request to him and . . . pass a motion. . . . [T]he Board can go to the Legislature to get funding for legal counsel because there is no money in the Department's budget for the Board to acquire outside counsel." There is nothing in the record to indicate the Board sought or obtained additional funding for this purpose.

On June 14, 1991, the Board authorized its president, Carrabino, to contract with independent counsel in the event litigation was necessary. Having obtained the Attorney General's consent to employ counsel other than the Attorney General, Carrabino secured the services of Zumbrun, Best & Findley (independent litigation counsel) as independent counsel, personally signing a contract on June 27, 1991.

On July 30, 1991, in writing, Carrabino asked the Superintendent to "certify that funds are available and process the agreement on or before August 9, 1991 to the appropriate state control agencies so that the firm will be paid . . . ." The Superintendent refused to process the agreement on grounds it was unauthorized and did not comply with state contract requirements.

On November 8, 1991, the Board ratified the legal services contract executed by Carrabino. In a letter to the Superintendent dated November 15, 1991, Carrabino reiterated his July 30 request to process the contract.

The Department's general counsel forwarded the legal services contract to the Department of General Services "as is," with a cover letter asserting reasons the contract should be disapproved.[34] General Services responded the agreement "cannot be approved *in its present form.*" (Italics added.) General Services listed the "more significant omissions," which included failure to submit: (1) four copies of the agreement on the proper form, (2) a copy of the relevant Board resolution approving the agreement, (3) a signatory card, (4) a statement of compliance with state requirements relating to minority, women's and disabled veterans' business enterprise participation, (5) a drug-free work place certification, (6) a statement of compliance with required nondiscrimination programs, and (7) written approval of the Attorney General. The Department of General Services also made specific suggestions to assist the Department in satisfying state contract requirements. It then stated, "Since there appears to be an issue as to the authority of the Board of Education to enter into this agreement and since we are precluded by law (§ 14610 of the Government Code)[35] from making a determination of such matters, we will request from you that we be provided authority on this issue either by the Attorney General or the courts."

The procedure followed by the parties with respect to the contract with independent litigation counsel differed from the procedure employed earlier to secure the services of independent counsel Howard Dickstein. In that instance, the Superintendent told the Board it could obtain legal counsel if conflict arose over specific policies adopted at the September 1990 meeting. When the Board declared there was a conflict, and requested legal assistance, the Superintendent processed the necessary paperwork through the Department.

---

[34]The cover letter states the Superintendent's belief he is specifically prohibited from certifying the availability of funds by section 5.00 of the 1991 Budget Act. (Stats. 1991, ch. 118, § 5.00.) The letter continues, "In the absence of this prohibition, however, [the] Superintendent . . . could certify to the availability of $150,000 by *redirecting* funds currently in the [Board] portion of the Department's budget which have been allocated to other purposes. Therefore, if you do not agree with [the] Superintendent['s] . . . understanding of Section 5.00 of the Budget Act, please assume the availability of $150,000 in funds." (Italics added.) The Superintendent does not raise the purported section 5.00 prohibition in these proceedings, and we need not address it. Nor does the Board take issue with the Superintendent's certification funds are available in the Board's current budget.

[35]Government Code section 14610 reads:

"Notwithstanding Section 11043, the [Department of General Services] may employ such persons as are necessary to provide house legal counsel for the department. These persons may advise the director, officers, employees, boards, commissions, and offices of the department concerning legal affairs of the department. The official legal adviser concerning the department's interdepartmental powers, functions, and relationships with other departments is the Attorney General. House legal counsel for the department when authorized by the Attorney General may represent the department and the state in litigation concerning affairs of the department."

During the course of this controversy, the Superintendent has offered the Board various reasons there is no clear, present, ministerial duty to implement its legal services contract with the Board's independent litigation counsel. Here the Superintendent contends the agreement is void because (1) the Board lacks contracting authority independent of the Department, and (2) the contract violates rudimentary statutory requirements applicable to all state contracts. The Board contends the Superintendent has a ministerial duty to conform the legal services contract to state requirements before forwarding it to the Department of General Services for approval. "[T]he procedural problems could have been eliminated if the respondent had properly processed the agreement as he was instructed to do." We conclude the Superintendent must process the legal services contract as requested by the Board.

Government Code section 11042 prohibits state agencies from employing legal counsel other than the Attorney General. Certain agencies, such as the Department of Education, are exempted from the general prohibition against employment of legal counsel. (Gov. Code, § 11041.) Thus, the Superintendent is represented in these proceedings by the General Counsel for the Department of Education. However, *any* state agency may engage private counsel in any matter in which that agency is interested if it first obtains the written consent of the Attorney General. (Gov. Code, § 11040.) In March 1991, the Board obtained the Attorney General's written consent to employ outside counsel to initiate this litigation on governance issues.

Moreover, the Board's authority to "adopt rules and regulations not inconsistent with the laws of this state . . . for its own government" (§ 33031) includes the authority to obtain outside counsel when necessary. Clarification of governance issues is a matter which relates directly to the Board's "government." As we stated, our review of Board policies is limited to the question whether the Board " 'reasonably interpreted the legislative mandate.' " (*Hartzell* v. *Connell, supra,* 35 Cal.3d at p. 914.)

However, the Board president may not negotiate and sign a legal services contract without following established procedures. Public Contract Code section 10295, subdivision (b), requires "[a]ll contracts entered into by any state agency for . . . (b) services, whether or not the services . . . are performed by an independent contract, . . . are void unless and until approved by the [Department of General Services]." The Superintendent correctly advised Carrabino the Board should request independent counsel through him.

Under section 33111, the Superintendent has a duty to "execute, under direction of the State Board of Education, the policies which have been

decided upon by the board . . . ." Thus the Superintendent must process the Board's proper request for independent counsel by completing the required forms, and forwarding them to the Department of General Services for final approval.

We conclude the Board is legally entitled to representation in litigation against the Superintendent on issues of governance, and the Superintendent is required to implement the Board's decision to obtain independent counsel. Because the Board did not follow the proper procedures in its attempt to secure representation, technically the Superintendent is under no clear, present, ministerial duty to process the purported contract. However, based on equitable principles which apply to these proceedings (*Bruce* v. *Gregory, supra,* 65 Cal.2d at p. 671), we shall view the Board's efforts to secure the services of the independent litigation counsel as a request the Superintendent complete paperwork necessary to obtain a valid legal services contract. The record demonstrates no meaningful impediment to the Superintendent processing the legal services agreement in the proper manner, working in cooperation with independent litigation counsel to address the specific problems raised by the Department of General Services.

Accordingly, a writ of mandate shall issue directing the Superintendent to execute the legal services contract as requested by the Board.

### DISPOSITION

Let a peremptory writ of mandate issue directing the Superintendent to: (1) implement Policy No. 2 by submitting to the Board four nominations under article IX, section 2.1 of the California Constitution; (2) implement Policy No. 5 by including in the Department's budget the Board's budget in the form adopted by the Board at its September meeting, by working with the Board's executive director in securing funding to implement the Board's program, and by implementing the amended bylaws to enable the Board to appoint additional staff when the budget is enacted; (3) implement the portion of the budget oversight policy which provides for periodic review of the performance evaluations of deputy superintendents, associate superintendents, exempt appointments, and division directors, and (4) process the Board's legal services contract as requested by the Board by working in cooperation with independent litigation counsel to correct the specific problems identified by the Department of General Services. The petition is denied in all other respects.

Sparks, Acting P. J., and Scotland, J., concurred.

A petition for a rehearing was denied March 16, 1993, and respondent's petition for review by the Supreme Court was denied May 27, 1993. Mosk, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

APPENDIX

The following policies were approved by the Board at its September 1990 meeting, and reaffirmed at its April 1991 meeting:

"ITEM 1 [POLICY No. 1]

"CALIFORNIA STATE BOARD OF EDUCATION
"ADVISORY AND GUIDELINE POLICY

"Policy: It is the policy of the California State Board of Education that it shall determine all questions of policy pursuant to Education Code § 33030. All advisories, guidelines, bulletins, memoranda, or other documents relating to policy, procedures, programs and issues, prepared by the State Department of Education shall be reviewed and approved by the Board prior to distribution to schools and/or school officials. In the event that an advisory, guideline, bulletin, memoranda, or other document cannot be submitted to the Board for prior approval, the Board must ratify the document within 45 days of distribution or the document shall automatically expire.

"Procedure: The following procedures shall be used to submit to the Board for approval proposed advisories, guidelines, bulletins, memoranda, or other documents relating to policy, procedures, programs, and issues.

"1. The State Department of Education staff shall submit to the Executive Director of the Board all proposed advisories, guidelines, bulletins, memoranda, or other documents relating to policy, procedures, programs, and issues. The Executive Director of the Board shall then submit all advisories, guidelines, bulletins, memoranda, or other documents to the Policy and Planning Committee for study. All proposed advisories, guidelines, bulletins, memoranda, or other documents shall be submitted to the Executive Director of the Board no later than the 15th day of each month for consideration at the next regularly scheduled Board meeting. At the time of submittal to the Board, the Superintendent of Public Instruction shall designate a State Department of Education staff member to be available to the Board to provide information and answer questions concerning the proposed advisories, guidelines, bulletins, memoranda, or other documents.

"2. The Policy and Planning Committee shall study the proposed advisories, guidelines, bulletins, memoranda, or other documents and recommend appropriate action to the Board which may include: approval, disapproval, or direction to the Department of Education to revise. The Policy and Planning Committee shall conclude the study in time to consider the proposal at the next regularly scheduled Board meeting.

"3. All proposed advisories, guidelines, bulletins, memoranda, or other documents of the State Department of Education shall be considered at regularly scheduled meetings of the Board. Board meetings are held on the second Friday and preceding Thursday of each month from September to July, inclusive.

"4. On approval by the Board, the Executive Director of the Board shall transmit the Board's action to the Department of Education for implementation. The Superintendent of Public Instruction shall report back to the Board at the Board's next regularly scheduled meeting of the Department's action.

"5. In the event an emergency advisory, guideline, bulletin, memorandum, or other document relating to policy, procedures, programs, and issues must be distributed by the State Department of Education and there is insufficient time to follow the above procedures, the following emergency steps shall be followed:

"a. The president of the Board shall be notified by telephone as soon as it becomes apparent to the State Department of Education that an emergency advisory, guideline,

bulletin, memorandum, or other document must be distributed to schools and/or school officials and there is insufficient time to have it considered at a regularly scheduled Board meeting.

"b. No less than three days before distribution of an emergency advisory, guideline, bulletin, memorandum, or other document by the State Department of Education, the president of the Board shall receive a copy of the emergency advisory, guideline, bulletin, memorandum, or other document together with supporting documents and a written explanation of why an emergency advisory, guideline, bulletin, memorandum, or other document must be distributed to schools and/or school officials without prior approval by the Board.

"c. Upon notification and receipt of a copy of the emergency advisory, guideline, bulletin, memorandum or other document, the president may, if it is deemed necessary, call an emergency meeting of the Board to act on the emergency advisory, guideline, bulletin, memorandum, or other document.

"d. If no emergency meeting is called by the President of the Board, the emergency advisory, guideline, bulletin, memorandum, or other document must be ratified by the Board within 45 days of its distribution or be deemed disapproved by the Board. In the absence of ratification by the Board, such document will automatically expire at the end of 45 days from the date of its issuance and any action taken pursuant to the emergency advisory, guideline, bulletin, or memorandum will be considered null and void. Every emergency advisory, guideline, bulletin, memorandum, or other document shall state on the first page thereof that it is merely exemplary, compliance is not mandatory, and it will expire at the end of 45 days of the date of issuance unless it is ratified by the Board.

"e. The President of the Board will immediately upon determining that an emergency Board meeting is unnecessary transmit the emergency advisory, guideline, bulletin, memorandum, or other document, along with all supporting material to the Executive Director of the Board. The Executive Director shall then transmit it to the Policy and Planning Committee for study and recommendation to the Board. The Executive Director shall take the necessary steps to ensure that the Board has the opportunity to consider the emergency advisory, guideline, bulletin, memorandum, or other document within 45 days of its distribution.

"f. The Executive Director of the Board shall notify the State Department of Education of the Board's decision whether to ratify the emergency advisory, guideline, bulletin, memorandum, or other document. The State Department of Education shall thereupon transmit the decision of the Board to the affected schools and/or school officials." The Board later adopted Dickstein's December 7, 1990, legal opinion which recommended Board approval of policy communications only, "in keeping with the SBE's role in the statutory scheme."

"ITEM 2 [POLICY No. 2]

"CALIFORNIA STATE BOARD OF EDUCATION
"POLICY FOR THE APPOINTMENT OF CONSTITUTIONAL OFFICERS

"Policy: To carry out the provisions of the California Constitution, the State Board of Education shall appoint one Deputy Superintendent of Public Instruction and three Associate Superintendents of Public Instruction for four year terms; such officers shall be exempt from state civil service. It is the further policy of the State Board of Education that in the event of a vacancy, the Board shall make interim appointments. These positions shall be funded by the Department of Education and adequate office space for these officers shall be provided by the Department.

"Procedure: The following procedures shall be utilized to appoint one Deputy Superintendent of Public Instruction and three Associate Superintendents of Public Instruction for four year terms; such officers shall be exempt from state civil service:

"1. Within 90 days of the first Monday after the first day of January of which the Superintendent of Public Instruction takes office, the Superintendent of Public Instruction shall nominate qualified individuals to be considered by the Board for Deputy Superintendent of Public Instruction and Associate Superintendent of Public Instruction. The nominations shall be submitted to the Executive Director of the Board.

"2. The Executive Director of the Board shall submit all nominations to the State Board of Education, sitting as a committee of the whole.

"3. The committee of the whole shall study the nominations and take appropriate action for the appointment of one Deputy Superintendent of Public Instruction and three Associate Superintendents of Public Instruction at the regularly scheduled March Board meeting.

"4. In the event a vacancy occurs, the screening committee of the Board shall screen applicants submitted by the Executive Secretary to fill the interim vacancy and make recommendations to the Board. The Board will consider and make interim appointments at a regularly scheduled Board meeting."

## "Item 4 [Policy No. 4]

### "California State Board of Education
### "Budget Review Policy

"Policy: It is the policy of the California State Board of Education that it shall review and approve an annual operating budget for the State Department of Education.

"Procedure: The following procedures shall be utilized to review and approve the annual operating budget for the State Department of Education:

"1. The State Department of Education shall submit to the Executive Director of the Board, a proposed annual budget for the operation of the State Department no later than August 15 of each year for consideration at the regularly scheduled September Board meeting. The Superintendent of Public Instruction shall designate a member of the State Department of Education's staff to be available to the Board to provide information and answer questions concerning the proposed operating budget. The budget information to be submitted to the Board shall include, but is not limited to, the following:

"(a) an overview of the proposed budget, which shall include a summary of the prior year's expenditures;

"(b) a summary and explanation of all budget change proposals;

"(c) a listing and overview of all state and federal funds included in the State Department of Education's proposed annual budget;

"(d) a listing of all state and federal funds which the Board has authority to administer including the specific statutory requirements governing their use; and

"(e) the process used to determine funding priorities.

"2. The Executive Director of the Board shall submit all budget information to the State Board of Education, sitting as a committee of the whole.

"3. The committee of the whole shall study the proposed annual budget of the State Department of Education and recommend appropriate action to the Board which may include approval, disapproval or direction to the State Department of Education to revise. The committee of the whole shall conclude its study of the proposed budget of the State Department of Education in time to be considered at the regularly scheduled September Board meeting."

"ITEM 5 [POLICY NO. 5]

"CALIFORNIA STATE BOARD OF EDUCATION
"PROGRAM PLANNING AND BUDGETING POLICY

"Policy: It is the policy of the California State Board of Education that it shall adopt for the following fiscal year, an annual budget for the operation of the Board at its September meeting. Pursuant to Education Code §§ 33111 and 33330, the budget shall be administered by the Superintendent of Public Instruction, in consultation with the Executive Director. The budget shall include sufficient resources so the Board can (1) meet its constitutional and statutory responsibilities, (2) provide statewide educational leadership, (3) address issues which have been identified in Article 2, §§ 33033, *et seq.*, of the Education Code, and (4) maintain a Board office in Sacramento, staffed by one Executive Director, one Senior Staff Counsel, one Associate Governmental Program Analyst, one Administrative Assistant, one Executive Secretary and three Secretaries. The Board's staff employees, as set forth above, shall be funded by the Department of Education and adequate office space and facilities for the Board and its staff shall be provided by the Department.

"Procedure: The following procedures shall be utilized to develop the Board's annual operating budget and program of work:

"1. The Executive Committee of the Board shall work with the Executive Director and other Board staff in the development of an annual budget and program of work. The program of work shall be for a two-year period of time, and will be updated annually.

" . . . . . . . . . . . . . . . . . . . . . . . .

"6. The Superintendent of Public Instruction shall include the Board's budget in the form adopted by the Board at its September meeting [on] the Department's budget, and shall work with the Executive Director in securing funding from the Governor and Legislature to implement the program of work for the next fiscal year.

" . . . . . . . . . . . . . . . . . . . . . . . ."

The Board also proposed an amendment to its bylaws relating to staff employees:

"ITEM 9

"CALIFORNIA STATE BOARD OF EDUCATION
"AMENDMENT TO BYLAWS
"ARTICLE IV
"OFFICERS, DUTIES, ORGANIZATION, AND OPERATIONS

" . . . . . . . . . . . . . . . . . . . . . . .

"ORGANIZATION AND OPERATION
 "section 9(a). The Board shall appoint the following staff employees to enable it to carry out its constitutional and statutory responsibilities:

 "1 Executive Director
 "1 Senior Staff Counsel
 "1 Associate Governmental Program Analyst
 "1 Administrative Assistant
 "1 Executive Secretary
 "3 Secretaries

"Section (b). The Board's staff employees, as set forth in this section, shall be funded by the Department of Education.

"Section (c). The Department of Education shall provide adequate office space and facilities in Sacramento for the Board and its staff employees. (Educ. Code § 33003)"

In June 1991, the Board ratified the Board president's position incorporating the budget oversight provisions from the first draft of the memorandum of understanding.

"C. *Budget Oversight*

"1. *Personal Services Contracts.*

"a. The SPI shall submit all proposed personal services contracts that the Department proposes to enter into in excess of $20,000 to the SBE for their review and prior approval.

"b. Upon expiration of each personal services contract referred to in subsection a. above, the SPI shall submit to the SBE all invoices, evaluations, work product and other documentation concerning said contact, for their review and prior approval, before issuing the final 'withhold' payment under said contract.

"c. The obligation described in subsection a. above shall also apply to a contract award of less than $20,000, if the award would result in one bidder, or an entity in which that bidder has a financial interest, receiving contracts from the SDE with a total value in excess of $20,000 in any one fiscal year.

"2. *Line Item Transfers.*

"The SPI shall obtain prior approval from the SBE for all budget line item transfers over $10,000.

"3. *Audits.*

"In connection with each SDE audit, the SPI shall provide the SBE with reasonable advance notice and invite it to send a representative to attend the entrance conference, exit conference, and any other meetings with the SDE's auditors at which either the SPI, a deputy superintendent or associate superintendent is in attendance.

"4. *Staff Performance and Appointment.*

"The SPI shall review with the Board at its request, but in no case less frequently than annually, in executive session if appropriate, the performance and evaluations of SDE deputy superintendents, associate superintendents, exempt appointments and Division Directors in the Department.

"5. *"Litigation and Settlements.*

"The SPI shall inform the SBE and provide monthly reports of all pending litigation in which the Department is involved and financial settlements of adverse actions entered into by the Department."