Filed 4/12/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| AMERICAN COATINGS ASSOCIATION, INC., | C085042 |
| Plaintiff and Appellant, | (Super. Ct. No. 04CS01707) |
| v. | |
| STATE AIR RESOURCES BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge.  Affirmed.

Norton Rose Fulbright US, Jeffrey B. Margulies, William L. Troutman and Andy Guo for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Matthew Rodriquez, Acting Attorney General, Diane S. Shaw, Assistant Attorney General, Molly K. Mosley, Robert E. Asperger, Carolyn Nelson Rowan and Michael Sapoznikow, Deputy Attorneys General, for Defendant and Respondent.

1

Health and Safety Code section 39613 requires respondent State Air Resources Board (the Board) to impose fees on manufacturers who sell consumer products and architectural coatings that emit volatile organic compounds (VOCs) of 250 tons or more per year.[1] The Board implemented the statute by adopting regulations that impose a uniform fee per ton on all affected manufacturers. (Cal. Code Regs., tit. 17, § 90800.8 et seq.) Appellant American Coatings Association, Inc. (the Association) sought a declaration that the statute and regulations are unlawful and unenforceable and a peremptory writ of mandate commanding the Board to vacate the regulations. The trial court denied the petition and complaint. On appeal, the Association contends the statute is a tax subject to Proposition 13, the fees imposed do not bear a reasonable relationship to the manufacturers' regulatory burden, the statute unlawfully delegates revenue authority to the Board, and the statute's regulations are arbitrary and capricious. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Board**

The Legislature created the Board for the purpose of controlling emissions from motor vehicles and coordinating, encouraging, and reviewing the efforts of all levels of government as they affect air quality. (§ 39500.) The Board is responsible for preparing the state implementation plan required by the federal Clean Air Act (42 U.S.C. § 7401 et seq.) and coordinating the activities of air quality districts to comply with that act. (§ 39602.) The Board has primary responsibility over motor vehicles; local and regional air pollution control districts are generally responsible for controlling other emission sources. (§§ 39003, 40000.)

_____

[1] All further statutory references are to the Health and Safety Code unless otherwise designated.

The California Clean Air Act of 1988 (Stats. 1988, ch. 1568) required the Board to adopt regulations to achieve the maximum feasible reduction in VOCs emitted by consumer products. (§ 41712, subd. (b).) VOCs comprise a major source of air quality pollution and contribute to the formation of ozone and particulate matter smaller than 10 microns. Ozone is the chief component of urban smog and both ozone and particulate matter smaller than 10 microns irritate the respiratory tract and may cause significant adverse health effects. Consumer products such as detergents, hair spray, liquid soaps, lubricants, automotive products, and insecticides are substantial sources of VOCs.

Architectural coatings such as paints, stains, sealers, and lacquers are also substantial sources of VOCs. The Board also may, as part of its duty to provide assistance to districts, recommend control measures to achieve feasible reductions in VOCs related to architectural paints or coatings. (§ 40916.)

**Sections 39612 and 39613**

In 2003 the Governor convened an extraordinary session of the Legislature to address a $21 billion state budget shortfall. Due to the shortfall, the Board, along with other agencies, faced the threat of significant budget reductions.

At the time, the Board's budget was divided into two categories: the "mobile source program" and the "stationary source program." The former included expenditures on vehicles and other sources of pollution from internal combustion engines, such as lawnmowers. The mobile source program's budget for 2002-2003 was approximately $110 million, almost all of which was funded by fees. The stationary source program included all other pollution sources, including consumer products and architectural coatings. Its budget was approximately $40 million, about half of which came from the general fund. The Board's efforts to regulate VOCs from consumer products and architectural coatings were paid out of the general fund and were not supported by fees.

In response to the budget shortfall, the Legislature adopted Assembly Bill No. 10X (2003-2004 1st Ex. Sess.) (Assembly Bill 10X), amending section 39612 and adding new section 39613.

Previously, section 39612 stated that the Board could collect "permit fees" from nonvehicular sources of pollution (permitted facilities) that are authorized by district permits to emit 500 tons or more per year of any "nonattainment pollutant or its precursors." (Former § 39162.) The total amount of fees that the Board could assess facilities was capped at $3 million a year. (Former § 39612, subd. (e).)

Assembly Bill 10X amended section 39612 to reduce the emissions threshold to 250 tons, and increased the cap on total fees to $13 million per year. (See Stats. 2003, 1st Ex. Sess., ch. 1, §§ 1-2.) As amended, the statute provides the Board may collect fees from nonvehicular sources of pollution that are authorized by district permits to emit 250 tons or more per year of any nonattainment pollutant or its precursors. The fees shall be expended only for the purposes of recovering costs of additional state programs related to nonvehicular sources of pollution. Section 39612 sets forth priority expenditures for the fees and requires that the Board report annually to the Legislature how the fees are expended.

Section 39613 applies to manufacturers of consumer products and architectural coatings (affected manufacturers).[2] The statute provides the Board "shall impose" a fee for any consumer product and architectural coating sold in the state if a manufacturer's total sales will result in the emission of 250 tons or greater per year of VOCs. Under

_____

[2] Section 39613 states: "The state board shall impose a fee for any consumer product, as defined in Section 41712, sold in the state any architectural coating sold in the state if a manufacturer's total sales of consumer products or architectural coatings will result in the emission in the state of 250 tons per year or greater of volatile organic compounds. Revenues collected from the imposition of this fee shall be used to mitigate or reduce air pollution in the state created by consumer products and architectural coatings, as determined by the state board, and shall be expended solely for those programs."

4

section 39613, "revenues collected from the imposition of this fee shall be used to mitigate or reduce air pollution in the state created by consumer products and architectural coatings, as determined by the state board, and shall be expended solely for those programs." The statute does not limit the amount of fees that may be collected.

**Fees Under the Statutes**

Subsequently, the Board adopted regulations to implement the legislation. (Cal. Code Regs., tit. 17, § 90800.8 et seq.) Although sections 39612 and 39613 impose fees on different pollution sources, the Board implemented fees using a single, uniform fee formula. Since Board staff perform similar tasks for both types of pollution sources, the Board determined it was "fairest" to treat one ton of emissions from a permitted facility the same as one ton of emissions from an affected manufacturer.

Under the Board's regulations, the fee per ton is calculated by (1) determining of revenues needed and authorized by the Legislature for programs related to nonvehicular sources, consumer products, and architectural coatings in the fiscal year, divided by (2) the adjusted amount by the total of billable tons of emissions generated by fee-paying sources. (Cal. Code Regs, tit. 17, § 90800.8, subd. (c).)

For permitted facilities, the amount of the fee is calculated by multiplying the fee per ton by the tons of nonattainment pollutants or precursors individually emitted, in annual amounts of 250 tons or more, by each permitted facility. For affected manufacturers, the amount of the fee is calculated by multiplying the fee per ton by the tons of VOCs emitted, in annual amounts of 250 tons or more, by each affected manufacturer. (Cal. Code of Regs., tit. 17, § 90800.8, subd. (c).)

The fees collected from the permitted facilities are to be expended only for the purposes of recovering costs of additional state programs related to nonvehicular sources. The fees collected from affected manufacturers are to be expended solely to mitigate or

reduce air pollution in the state created by consumer products and agricultural coatings. (Cal. Code Regs., tit. 17, § 90800.8, subd. (a)(4).)

**Calculation of Fees**

For the initial 2003-2004 fiscal year, the Legislature's budget estimated that the Board would collect $17.4 million in fees to recover costs related to nonvehicular sources, consumer products, and agricultural coatings in the fiscal year. After adding a 3 percent adjustment for unforeseen reductions in collections, the Board stated it would attempt to collect $17.9 million in needed revenues. The fee per ton was calculated by dividing this amount by the billable tons of emissions from regulated sources.

Using emissions data from the most recently completed emissions inventory in 2001, the Board calculated the billable tons of emissions from regulated sources. In this determination, the Board did not include emissions from stationary sources in attainment areas, because they are not subject to fees under the regulation. The Board also excluded emissions of any pollutant that is individually less than 250 tons per year, emissions from sources not covered by the legislation, emissions from sources not regulated by the stationary source program, and emissions from sources on which the Board expended little or no resources. The Board excluded approximately 68 percent of total statewide nonvehicular sources of emissions from its calculation of billable tons of emissions.

The Board divided needed revenues, $17.9 million, by the billable tons of emissions from regulated sources and calculated a proposed fee of $86.55 per ton of emissions. Using this formula, the Board estimated that permitted facilities would bring in $10.7 million in revenue in 2003, about 27 percent of the stationary source program's budget. Affected manufacturers would bring in $7.2 million, or about 18 percent of the program's budget.

The Board estimated that stationary sources are responsible for approximately 68 percent of the emissions regulated by the stationary source program, manufacturers of

architectural coatings and consumer products are responsible for about 19 percent of such emissions, and that the other sources are responsible for the remaining 13 percent of emissions. The Board also estimated its program expenditures track these percentages. The Board estimated it spent about $26.9 million, 68 percent of its $39.6 million budget, regulating emissions of stationary sources, and about $7.6 million, 19 percent of its budget, regulating emissions of architectural coatings and consumer products. Under this calculation, the portion of the budget funded by architectural coatings and consumer products, about 18 percent, was consistent with their contribution to the total emissions, about 19 percent.

**Challenges to the Fees on Affected Manufacturers**

Manufacturers of architectural coatings and consumer products challenged the proposed fees on affected manufacturers, arguing the Board overstated the costs of their products and failed to establish the required relationship between the fees imposed and the costs incurred by the Board. In response, the Board, in July 2003, prepared and published a second estimate employing a different methodology, of staff costs. The study estimated that 67 fulltime employees worked on programs relating to architectural coatings and consumer products at an annual cost of approximately $7.8 million.

After receiving another request for more information, the Board offered a third estimate. The estimate was again based on a study of staff time, but provided more detail. The Board released a refined analysis, which found the cost of regulating all architectural coatings and consumer products was approximately $8.9 million.

**Collection of Fees**

Assembly Bill 10X allowed the Legislature to reduce the general fund contribution to the Board in 2003-2004 by $16.4 million. The Board made $2 million in spending cuts and the remaining $14.4 million was collected through increased fees. The Board

assessed $6.8 million in fees on affected manufacturers, or 17 percent of the Board's stationary source program budget.

The following year, the Legislature's budget required the Board to collect an additional $2.6 million in fees, so the combined revenue for consumer products and architectural coatings and the permitted facilities fee would be $20 million. The Board promulgated a new regulation, California Code of Regulations, title 17, section 90805, that increased the fee on permitted facilities by $2.6 million, but left the affected manufacturers unchanged. Accordingly, the permitted facilities paid more per ton of emissions than affected manufacturers. In 2004-2005, affected manufacturers paid $94.03 per ton of VOC emissions; permitted facilities paid $116.53 per ton.

The Board employed this methodology in fiscal year 2005-2006 and thereafter to calculate the annual fees. The amount of needed revenues to fund the stationary source program has remained approximately the same: $17.4 million before adjustments and $17,922,000 after adjustments. Because the total billable emissions have been reduced, from 207,066 tons in 2003-2004 to 93,629 tons in 2013-2014, the fee per ton has increased from $86.55 to $197.77 over that time period.

**The Association's Complaint**

In 2004 the Association filed a complaint for declaratory and injunctive relief and a petition for writ of mandate, challenging the validity of the fees imposed on affected manufacturers of architectural coatings and other consumer products. In 2007 the trial court entered an order staying the proceedings pending the California Supreme Court's decision in *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421 (*Farm Bureau*).

In 2012, following *Farm Bureau*, the Association filed its first amended complaint for declaratory and injunctive relief and petition for writ of mandate setting forth nine causes of action.

8

1.  Section 39613 violates due process because it: arbitrarily targets only certain products that contain VOCs excluding other sources of emissions; unfairly requires affected manufacturers to subsidize the costs of regulations attributable to other sources; fails to limit fees that may be imposed; and imposes fees only on large manufacturers.

2.  Section 39613 violates equal protection by drawing arbitrary classifications between affected manufacturers subject to the fee and manufacturers of the same targeted products who are not required to pay the fee, stationary source facilities subject to the fee under section 39612, and emitters of VOCs who are not required to pay any fee.

3. & 4.  Section 39613 and its implementing regulations violate Proposition 13 because the fees are actually taxes which were not approved by the required two-thirds vote of the Legislature.

5.  Section 39613 violates the separation of powers under the California Constitution because it represents an unconstitutional delegation of legislative power to the Board.

6. & 7.  The assessments exceed the Board's authority and are not reasonably necessary to accomplish the purposes of the statute because the regulations retroactively assess fees to cover the current program costs based on the previous years' emissions data and because the fees are not expended solely for mitigation programs.

8. & 9.  The yearly assessments violate due process and equal protection because the fees are arbitrary and capricious and do not relate to any reasonable legislative goal.

Following oral argument, the trial court denied the Association's petition. The Association filed a timely notice of appeal.

9

# DISCUSSION

## I

### *Proposition 13*

The Association argues Assembly Bill 10X masquerades as a fee but is, in reality, a tax, subject to Proposition 13. The Association presents a three-prong challenge to Assembly Bill 10X as a fee: the regulations impose fees on affected manufacturers that do not bear a reasonable relationship to their regulatory burden; the Board's determination of billable emissions arbitrarily excludes emissions that create burdens on the stationary source program; and the Board did not properly assess program costs attributable to affected manufacturers or individual pollutants.

Proposition 13 requires that "any changes in State taxes enacted for the purpose of increasing revenues" be passed by a two-thirds majority of the Legislature. (Cal. Const., former art. XIIIA, § 3, added by initiative, Primary Elec. (June 6, 1978); amended by initiative, Gen. Elec. (Nov. 2, 2010), commonly known as Prop. 26.) Assembly Bill 10X was not passed by a two-thirds majority of the Legislature. Therefore, if the fee provisions of section 39613 are "changes in State taxes enacted for the purposes of increasing revenues," the statute is an illegal tax.

**Background**

Whether section 39613 imposes a tax or a fee is a question of law decided upon an independent review of the record. The plaintiff challenging a fee bears the burden of proof to establish a prima facie case showing the fee is invalid. If the plaintiff produces sufficient evidence to make a prima facie case, the burden shifts to the government to refute the prima facie case. To meet its burden of production, the government must produce evidence showing the estimated costs of the regulatory activity, and the basis for determining the manner in which the costs are apportioned, so that charges allocated to a

10

payer bear a fair or reasonable relationship to the payer's burdens on or benefits from the regulatory activity.  (*Farm Bureau, supra*, 51 Cal.4th at pp. 436-437.)

As the Supreme Court observed in *Farm Bureau*, "We have recognized that ' "tax" has no fixed meaning, and that the distinction between taxes and fees is frequently "blurred," taking on different meanings in different contexts.  [Citations.]' " (*Farm Bureau, supra*, 51 Cal.4th at p. 437; see also *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 (*Sinclair Paint*).)  Ordinarily taxes are imposed for revenue purposes and not in return for a specific benefit conferred or privilege granted.  Most taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other governmental benefits or privileges.  (*Sinclair Paint, supra*, at p. 874.)

However, a fee may be charged by a governmental entity so long as it does not exceed the reasonable costs of providing services necessary to regulate the activity for which the fee is charged.  A fee may not be imposed for unrelated revenue purposes. (*Farm Bureau, supra*, 51 Cal.4th at p. 437; *Sinclair Paint, supra*, 15 Cal.4th at p. 876.)

"The scope of a regulatory fee is somewhat flexible and is related to the overall purposes of the regulatory governmental action."  (*Farm Bureau, supra*, 51 Cal.4th at p. 438.)  A government entity may impose a fee under the police power when the fee equates to the amount necessary to carry out the purposes of the regulation.  In addition, regulatory fees are valid despite the absence of any perceived benefit to the fee payers. The mere fact a fee exceeds the reasonable costs of providing the service or regulatory activity for which it is charged does not transform the fee into a tax.  The question of proportionality is not measured on an individual basis.  Instead it is measured collectively, considering all rate payers.  (*Ibid.*)

"Thus, permissible fees must be related to the overall cost of the governmental regulation.  They need not be finely calibrated to the precise benefit each individual fee payor might derive.  What a fee cannot do is exceed the reasonable cost of regulation

11

with the generated surplus used for general revenue collection. An excessive fee that is used to generate revenue becomes a tax." (*Farm Bureau, supra*, 51 Cal. 4th at p. 438.)

Numerous courts have parsed the dividing line between a fee and a tax, establishing guidelines for evaluating the regulation or law in question. The Supreme Court set forth the relevant factors in *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1050-1052 (*California Building Industry*).

First, whether the approved fees would exceed the reasonable, estimated costs of administering the permit program. Second, whether the fee is used to generate excess revenue, that is, to generate more revenue than necessary to pay for the regulatory program. Finally, whether any class of fee payers is shouldering too large a portion of the associated regulatory costs. (*California Building Industry, supra*, 4 Cal.5th at pp. 1050-1052.)

The first two questions constitute the "aggregate cost inquiry," which examine the "size of the fee revenue pie" in relation to total regulatory costs. (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1210-1212; *California Building Industry, supra*, 4 Cal.5th at p. 1052.) The final question is an "allocation inquiry" and considers "how the pie is sliced." (*San Buenaventura, supra*, at p. 1212; *California Building Industry, supra*, at p. 1052.)

**Aggregate Cost**

The aggregate cost inquiry considers if the challenged fee generates more revenue than necessary to support the regulatory program supported by the fee. (*California Building Industry, supra*, 4 Cal.5th at pp. 1050-1051.) The Association argues the Legislature intended the fees raised by the statute to replace tax revenue used to support the Board's budget so it could use that tax revenue elsewhere. According to the Association, regulation was not the primary purpose of the fee measure; its only purpose was to generate revenue.

12

Section 39613 explicitly requires that all fee revenues must be used to mitigate or reduce air pollution in the state created by consumer products and agricultural coatings and must be expended only for those programs. The statute's language reveals a "specific intention to avoid imposition of a tax." (*Farm Bureau, supra*, 51 Cal.4th at pp. 438-439.) As the trial court noted: "Section 39613 does not create authority to regulate; it merely empowers [the Board] to establish a fee to support regulatory activities authorized by other statutes. Those activities, in turn, are constrained by the annual budget process and by the other statutes governing [the Board]." As the trial court also noted, there was no direct evidence that the funds collected from the affected manufacturers were spent for purposes unrelated to the regulatory activities for which the fees were charged.

The Association also contends the needed revenues in the fee formula are not reasonably related to the affected manufacturers' regulatory burdens.

Under the Board's regulations, the fee charged to affected manufacturers is determined by multiplying a uniform fee per ton by the billable tons of VOCs emitted by each affected manufacturer. The fee per ton is calculated by determining the amount of needed revenues to recover the costs of programs related to nonvehicular sources, consumer products, and architectural coatings in the fiscal year. This amount is divided by the billable tons of emissions from regulated sources. Needed revenues are based on the Board's budget. From 2003 through 2013, the Board estimated its needed revenues at $17.4 million before adjustments and $17,922,000 after adjustments.

To determine billable tons of emissions from regulated sources, the Board begins with raw emissions data from its most recently completed statewide emissions inventories. The Board excludes emissions from sources not regulated by the stationary source program and emissions from sources the Board states it expends little or no resources. The Board then adjusts the figure to exclude nonbillable emissions, which are emissions from sources that are not subject to regulatory fees.

13

The Association argues these calculations are flawed because these exclusions require the affected manufacturers to pay a higher fee per ton and more than their fair share of the regulatory costs. According to the Association, affected manufacturers have been subsidizing costs properly attributable to nonfee paying emitters. Instead, the emissions base should include all statewide emissions and fees should be allocated to manufacturers based on their respective contributions to statewide emissions.

The trial court carefully considered the Association's objections to the methodology employed by the Board and found the fee-per-ton calculation problematic. The court noted that the estimate of needed revenues is determined by how much the Legislature directs the Board to seek in the budget and is not necessarily based on how much revenue is actually needed for regulatory activities.

The court concluded: "Although the court is persuaded that [the Board's] methodology is flawed, this does not necessarily mean there is no reasonable relationship between the fees imposed on Affected Manufacturers and the burdens they impose on the Stationary Source Program. The reason for this discrepancy is that [the Board] has not collected 100% of its regulatory costs from Affected Manufacturers. As discussed above, the amount of fees collected from Affected Manufacturers has been less than the amount expended by [the Board] to regulate emissions from architectural coatings and consumer products. [¶] Based on the information supplied by [the Board], during the period from 2003-04 to 2012-13, Affected Manufacturers paid only a portion of the (estimated) costs incurred by [the Board] to regulate architectural coatings and consumer products, ranging from a low of 60% to a high of 89%. On average, Affected Manufacturers paid about 79% of the costs. [Citation.] The question becomes, therefore, whether it is reasonable for [the Board] to require Affected Manufacturers to pay, on average, about 79% of the regulatory costs related to architectural coatings and consumer products."

The trial court ultimately found the Board's methodology reasonable. We agree. The Board determined some emissions did not substantially impact the costs of the

14

program, so these emissions were not included in the estimations of the costs attributable to consumer products and architectural coatings. The Board also excluded other pollution sources that it expends few resources to control. In addition, the Board concluded the stationary source program did not use substantial resources to regulate facilities in attainment zones and did not include those emissions in its calculation. All of these decisions were reasonable given the regulatory purpose of the fee and the burden imposed by the affected manufacturers' emissions.

**Allocation**

In considering the question of allocation, we determine "whether any class of fee payers is shouldering too large a portion of the associated regulatory costs." (*California Building Industry, supra*, 4 Cal.5th at p. 1052.) "The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors." (*Farm Bureau, supra*, 51 Cal.4th at p. 438.) A fee is valid if there is a reasonable basis in the record for the allocation. (*California Building Industry, supra*, at p. 1052.) The record need only demonstrate a reasonable relationship, not an exact relationship. Courts employ a " 'flexible assessment of proportionality within a broad range of reasonableness' " in determining the constitutionality of fees. (*Equilon Enterprises LLC v. Board of Equalization* (2010) 189 Cal.App.4th 865, 870, 883.)

The trial court found the Association failed to show that the Board's methodology, despite its flaws, produced an unreasonable relationship between the fees assessed on the affected manufacturers and the burdens they impose on the program. "The relationship between the fees assessed on Affected Manufacturers, and the burdens they impose, although imperfect, is within the range of reasonableness, even if Affected Manufacturers emit only about 64% of the total emissions. (In fact, Affected Manufacturers likely emit some portion of the non-billable emissions, meaning that their total burden on the Program is greater than 64%. For example, the Final Statement of Reasons indicates that

the Affected Manufacturers of architectural coatings emit 85% of the VOC emissions from all architectural coatings sold in California.)  While the court has concerns about the process used by [the Board] to set the fees, the court is persuaded that the resulting fees are reasonably related to the burdens imposed by the Affected Manufacturers, and are not illegal taxes."

We agree.  The Association faults the Board for excluding manufacturers that emit less than 250 tons per year.  In exempting these manufacturers, the Board reasoned: "[P]roducts sold by the 27 companies subject to the proposed fees emit 85 percent of the VOC emissions from all architectural coatings sold in California.  The remaining 151 companies are only responsible for the remaining 15 percent of VOC emissions. Therefore, especially with respect to architectural coatings, we believe the 250 ton per year threshold has captured the large majority of the emissions."  The Legislature may exempt individual smaller polluters that contribute little to the overall pollution being regulated, even if the cumulative burden is significant.  (*California Assn. of Prof. Scientists v. Department of Fish and Game* (2000) 79 Cal.App.4th 935, 942, 950.)

The Association argues this court has held that a regulatory fee is invalid where fee payers pay costs attributable to nonpayers.  (*Northern California Water Assn. v. State Water Resources Control Bd.* (2018) 20 Cal.App.5th 1204, 1222-1223.)  In *Northern California Water Assn.*, a water rights fee was charged only on holders of modern water permits and licenses, not on those who held other water rights.  The appellants argued they were paying for activities of the exempt parties, which accounted for about 38 percent of California's surface water.  (*Id.* at pp. 1209-1212.)  We disagreed and found the fee satisfied the allocation inquiry because the program used about 90 percent of its resources to regulate the fee payers and there was sufficient nonfee revenue to support any other activities.  (*Id.* at p. 1218.)  We reaffirmed that flexibility is an essential part of whether or not an allocation is reasonable.  (*Id.* at p. 1219.)

The Association also points out as proof of an unreasonable allocation that fees have increased as emissions have decreased. However, as the trial court noted, this fact shows the Board's regulatory efforts are working; as the amount of pollution subject to fees decreases, the fee per ton rises.

## II

### *Delegation of Authority/Separation of Powers*

The Association contends section 39613 unlawfully delegates revenue authority to the Board. Section 39613 states: "Revenues collected from the imposition of this fee shall be used to mitigate or reduce air pollution in the state created by consumer products and architectural coatings, as determined by the state board, and shall be expended solely for those programs."

**Background**

The separation of powers doctrine under article III, section 3 of the California Constitution is designed to prevent the unconstitutional delegation of authority from the Legislature to a state agency. The core functions of the legislative branch include the determination and formulation of legislative policy. (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 750 (*Honig*).) This power vests exclusively in the Legislature and may not be delegated. However, the passage of time has blurred the boundaries of governmental functions with the advent of administrative agencies. (*California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 829-830.)

An unconstitutional delegation of legislative power occurs if the Legislature confers upon an administrative agency unrestricted authority to make fundamental policy decisions. (*Honig, supra*, 13 Cal.App.4th at p. 750.) However, the doctrine prohibiting delegation of legislative power is not violated if the Legislature makes the fundamental policy decisions and delegates to an administrative agency the task of determining how

17

the legislative goals will be achieved. The Legislature may, after adopting a policy, confer upon an agency the power to determine the details by prescribing administrative rules and regulations to promote the purposes of the legislation and carry it into effect. (*Ibid.*; *Kugler v. Yocum* (1968) 69 Cal.2d 371, 381.) The rule against delegation does not invalidate reasonable grants of quasi-legislative power to an administrative agency if adequate safeguards exist to protect against the misuse of that power. (*Honig, supra*, at p. 751.)

**Discussion**

The Association argues section 39613 unlawfully delegates legislative power to the Board because it gives the Board "carte blanche" to regulate affected manufactures and a "blank check" to pay for regulatory activities without adequate safeguards to prevent abuse. According to the Association, the safeguards set forth in the statute—the fee may only be collected from manufacturers whose products result in emissions of 250 tons or more per year and may only be spent on activities related to consumer products and architectural coatings—are inadequate. The statute fails to address the critical point of how much the Board can actually collect, but only states the Board "shall impose a fee."

The Association points out that section 39612, unlike section 39613, imposes a statutory cap on the fee that may be collected, establishes a list of priority activities to be funded with the fees, and requires the Board to report how the fees are expended.

Section 39613 does not give the Board the authority to regulate, instead the statute empowers the Board to establish a fee to support the regulatory activities authorized by other statutes. These statutes establish the Board's mission (§§ 39003, 39500), structure (§ 39510 et seq.), and powers and duties, including the regulation of architectural coatings. (§§ 39600 et seq., 39701 et seq., 40916, 41712.)

18

Nor is section 39613 a "blank check" conferring "carte blanche," because the statute requires the fees collected be used for programs to mitigate or reduce pollution created by consumer products and architectural coatings. Through appropriations in the annual budget act, the Legislature dictates the amount the Board may spend to operate its stationary source program, limiting the amounts the Board may collect with the facilities fee and consumer products and architectural coatings fee.

Although section 39613 confers on the Board the discretion to determine how best to mitigate or reduce pollution created by consumer products and agricultural coatings, such a delegation does not render the statute an unconstitutional delegation of power. The doctrine prohibiting delegation of legislative power is not violated when the Legislature makes the fundamental policy decision and delegates to an agency the task of carrying out the mandate of the legislation. (*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 507.) We agree with the trial court's assessment that "While the Legislature could have included additional safeguards, as it did in Section 36912, the court is not persuaded that more stringent and specific standards are required to prevent abuse."

We invalidate a legislative enactment as an unlawful delegation of legislative power only in the event of a total abdication of that power, through failure either to render basic policy decisions or to assure that they are implemented as made. (*People ex rel. Lockyer v. Sun Pac. Farming Co.* (2000) 77 Cal.App.4th 619, 634.) We find no such abdication.

## III

### *Due Process and Equal Protection*

The Association argues section 39613 and its implementing regulations violate due process and equal protection. According to the Association, the statute is arbitrary and capricious because it distinguishes between manufacturers of architectural coatings

19

and consumer products based on whether they emit more or less than 250 tons per year of VOCs without a rational basis. In addition, the regulations are arbitrary and capricious because the fee formula forces affected manufacturers to pay more than their fair share of the program costs without a rational basis.

**Standard of Review**

The parties agree we consider substantive due process claims under the rational basis test. Under this test, we uphold governmental activity if it reasonably relates to a proper legislative goal, and if there is any reasonably conceivable set of facts that provides a rational basis for the government's classifications. (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125; *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1140.)

The law must not be unreasonable, arbitrary, or capricious; it must have a real and substantial relationship to the objective of the law. A substantive due process violation requires more than ordinary government error, instead it requires some form of outrageous or egregious conduct constituting a true abuse of power. (*Gray v. Whitmore* (1971) 17 Cal.App.3d 1, 21; *Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 855-856.) When considering a statute under the rational basis test, we acknowledge a statute bears a strong presumption of validity. The test is extremely deferential and we do not inquire into the wisdom of governmental action. Nor do we assess the wisdom, fairness, or logic of legislative choices. (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 363-364; *Las Lomas Land Co., supra*, at p. 858.) A statute violates the equal protection clause if it selects a particular class of persons for a taxation with no rational basis to support it. (*John Tennant Memorial Homes, Inc. v. City of Pacific Grove* (1972) 27 Cal. App.3d 372, 379.)

**Discussion**

The Association presents multiple challenges to the fee imposed under section 39613: (1) there is no rational basis to exclude sources that emit less than 250 tons per year; (2) the fee per ton formula is arbitrary; (3) the formula arbitrarily shifts the costs of excluded sources to affected manufacturers; and (4) the fee per ton does not account for differences in the impacts of emissions.

In essence, the Association contends the statute has resulted in an inconsistent and unfair regulatory scheme in which the affected manufacturers are required to shoulder the costs of regulation attributable to other emitters. According to the Association, affected manufacturers pay 40 percent of all fees, despite the fact that consumer products and agricultural coatings account for only 19 percent of the stationary source emissions inventory and 6 percent of the total emissions of pollutants in the state. The trial court disagreed.

On appeal, the Association renews its contention that there is no rational basis for the Board to shift the regulatory costs associated with excluded sources of emissions to fee payers. The Board argues the Legislature limited the fees to manufacturers of consumer products and architectural coatings because, when section 39613 was enacted, the stationary source program expended about 87 percent of its resources mitigating pollution from these products. The 250-ton limit rational for excluding smaller polluters included factoring in the costs of attempting to collect numerous small fee payments, the potential adverse financial impact on vulnerable small businesses, and the greater ability of larger polluters to take measures to reduce pollution. The Legislature concluded including numerous small manufacturers who produce a minority of the relevant emissions would be inefficient and counterproductive and reasonably determined that 250 tons should be the dividing line for imposition of the fee.

In addition, the Board contends the Legislature rationally exempted facilities located in attainment zones because the state's major population centers are all located in

21

nonattainment zones, areas where pollution routinely exceeds state and national standards. Attainment zone pollution is less damaging because the baseline air quality is better and the population smaller than in nonattainment zones. The Board spends less regulating facilities in attainment zones than in nonattainment zones, making it reasonable to assess fees only against manufacturers in nonattainment zones.

In a related argument, the Board explained it decided to exclude emissions it spends "little or no resources" controlling in calculating a cost estimate. Instead, the Board identified pollution sources that the program focuses on, determined that the spending on those emissions sources is roughly proportional to the level of emissions from each source, and then balanced the fees to ensure they bear a reasonable relationship to program spending. Ultimately, the Board determined a single uniform fee, reasoning a single ton of pollution requires roughly the same amount of resources, regardless of the source. The Board pointed out that, since 2004, the permitted facilities have actually paid more per ton than affected manufacturers.

The Association also finds arbitrary and unreasonable that, as the amount of pollution subject to the fees is reduced, the fee per ton rises. The Board counters that it is reasonable to shift the costs of regulatory activities from the taxpayers to those responsible for the pollution.

The trial court found section 39613 and its implementing regulations did not violate due process or equal protection. The court noted that while it "may take issue with the methodology used by [the Board] to set and apportion the fees, the court is not persuaded that [the Board's] approach has resulted in an 'outrageous' or 'egregious' regulatory scheme by which Affected Manufacturers are unfairly required to shoulder regulatory costs properly attributable to other emitters."

We agree with the trial court's assessment. The disparities the Association points to as violating equal protection and due process are fundamentally the Legislature's decision to exempt sources that emit less than 250 tons and the Board's decision to

22

impose a single per-ton rate.  Both issues are addressed in the record, in the Board's brief, in the trial court's decision, and in our previous discussion.  We cannot find there was no reasonable basis for treating affected manufacturers, including the Association, differently than other sources of emissions.

### DISPOSITION

The judgment is affirmed.  The Board shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                        /s/
                                   RAYE, P. J.



We concur:


    /s/
BLEASE, J.


    /s/
MAURO, J.


23